In re Freddie MUTSCHLER and Marlys Mutschler, d/b/a Mutschler Farms, Debtors.

MANAGEMENT JETS INTERNATIONAL, INC. and C.I.T. Corporation, Plaintiffs,

v.

Freddie MUTSCHLER and Marlys Mutschler, Defendants.

Bankruptcy No. 83–05004.
Adv. No. 83–7165.

United States Bankruptcy Court, D. North Dakota.

Nov. 7, 1984.

Joanne H. Ottmar, Jamestown, N.D., for Management Jets.

Roger J. Minch, Fargo, N.D., for C.I.T.

George E. Duis, Fargo, N.D., for Mutschlers.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The Plaintiffs, Management Jets International, Inc. (MANAGEMENT JETS) and C.I.T. Corporation (CIT), commenced the instant action predicated upon section 523(a)(2)(B) of the Bankruptcy Code. By their Complaint, it is alleged that there were material misrepresentations and omissions in a financial statement given to them by the Debtor, Freddie Mutschler (MUTSCHLER), and in reliance thereon CIT was induced to loan Mutschler $1,065,625.00 towards the purchase of a 1979 Cessna Citation jet aircraft, and Management Jets in reliance thereon was induced to loan him $134,931.15 for the balance of the plane's purchase price. CIT is seeking a deficiency judgment in the principal sum of $480,-447.50 plus accrued interest and expenses remaining after repossession and sale of the plane. Management Jets is seeking the sum of $134,931.15 representing the principal on its note plus accrued interest. The Debtor admits that a financial statement was given the Plaintiffs but denies it was

materially false, that it was given with the intent to deceive, or that the Plaintiffs reasonably relied upon it. The Debtor has also raised the issue of whether the eventual sale of the plane after repossession was in a commercially reasonable manner.

Trial was commenced on September 13, 1984, lasting over several days with the testimony of 18 witnesses and the introduction of 118 pieces of documentary evidence. From the evidence presented, the Court finds the following facts material to the resolution of this case:

## FINDINGS OF FACT

### 1.

Resolution of this case requires a detailed analysis of the circumstances surrounding the preparation, dissemination and use of a financial statement signed by Mutschler on June 1, 1981.

Freddie Mutschler is a large North Dakota farmer who in 1981 farmed some 12,000 acres. He was a pilot of some experience and over the years had purchased a number of aircraft of various types. In late fall of 1981, he noticed an ad in a trade magazine for a 1979 Cessna Citation offered for sale by Management Jets. Interested in the plane for possible charter use, discussions took place with Management Jets resulting in a purchase order being signed for the plane on December 2, 1981, for a purchase price of $1,290,000.00.

Mutschler was given a trade-in allowance of $545,000.00 on two planes traded in which had remaining indebtedness against them of $494,283.00. This indebtedness was taken care of by Management Jets from funds received from CIT. Mutschler paid $50,000.00 as a down payment and suggested he would first attempt to secure financing on his own. When that proved fruitless, Management Jets undertook to locate financing for him. CIT agreed to finance the purchase and on January 7, 1982, extended Mutschler a loan in the sum of $1,065,625.00 evidenced by a promissory note signed by Mutschler and secured by the plane itself. CIT, with authority from

Mutschler, paid over this sum to Management Jets on or about January 8, 1982, and Management Jets in turn paid off the balance remaining on the two trade-ins leaving $571,342.00 to be applied against the purchase balance which, as of January 8, 1982, was $706,272.42 (calculated by deduction of the down payment, the trade-in allowance and adding in interest accrued from December 1, 1981 through January 8, 1982). This left a balance due of $134,930.00. On January 8, 1982, Mutschler gave Management Jets his personal 60-day note for the remaining balance with interest at 16% per annum during the term of the note and 18% thereafter. He further agreed that Management Jets would retain possession of the plane until the note was paid. After making one installment payment on the CIT obligation, Mutschler defaulted causing CIT to accelerate the payments and calling the entire balance due. He was notified in August of 1982 of the acceleration and advised that repossession and public sale of the aircraft would result with a claim being made for any remaining deficiency. In November of 1982 he was advised that a public sale would take place on December 7, 1982, but would be cancelled if payment of the then past due payments was made. CIT, prior to selling the plane, published notification of the sale twice in three recognized trade publications as well as in the Lincoln and Omaha, Nebraska papers and the Jamestown, North Dakota Sun. The advertisements did not refer to the fact that it was a repossession. A number of inquiries were received but for various reasons no bids were obtained prior to the sale date. A sheriff's sale was conducted on December 7, 1982, at the premises of Management Jets with no one present except CIT representatives who bid in the price of $675,000.00. This price was based on the then current average wholesale value of the plane as derived from a composite of figures CIT received from checking with six dealers around the country. It was explained at trial that the market for this type of plane had dropped dramatically due to a market glut and the generally poor economy. After deducting the sheriff's

sale proceeds, the balance remaining on the Mutschler note was $480,447.50 plus sale expenses of $7,204.54. Interest accrued to October 3, 1984, is $153,208.80 at a per diem rate of $233.55. CIT seeks judgment in the sum of $640,860.84 plus per diem after October 3, 1984. Subsequent to purchase of the plane at the sheriff's sale, CIT was able to resell the plane through a broker for $915,000.00. This sale occurred in July 1983 for the then fair market price. The evidence established that values of small jet aircraft are extremely volatile and can change dramatically in relatively short periods.

The plane, although registered in Mutschler's name, was never actually released to him by Management Jets, the intention being for them to retain it until the $134,-000.00 note had been paid off. No payments were ever made to Management Jets and as of October 2, 1984, a balance of $134,931.15 plus interest of $67,008.29 at $67.47 per diem remained due. Management Jets seeks judgment in the sum of $201,939.44 plus per diem after October 2, 1984.

### 2.

We turn now to a discussion of the financial statement in question. In conformity with its usual practice, Management Jets through its salesman, requested Mutschler to provide a financial statement and tax returns for use by it in obtaining possible financing. Mutschler had many times in the past provided financial statements to banks as well as lenders involved in aircraft purchases. In response to the request of Management Jets, he provided them in December 1981 with an unaudited one-page financial statement bearing the date June 1, 1981. This statement was provided to Management Jets either directly by Mutschler or through another finance company, but in either case it was clear from the testimony that Mutschler intended Management Jets to receive this particular statement. Although six months old when given to Management Jets, Mutschler testified it was his financial statement and contained a fair summary of his assets as of June 1, 1981. He also stated he knew it was going to be used by Management Jets in an effort to locate financing. He testified that as of December 1981 it was the most current statement he had. The same statement was given by him to another finance company in February 1982 in connection with an unrelated matter. Management Jets, upon receiving the financial statement, contacted several finance companies requesting possible financing of the plane for Mutschler and sent the financial statement, along with Mutschler's 1979 and 1980 tax returns, to the Omaha branch of CIT which ultimately did finance the purchase.

The June 1, 1981 statement depicted a net worth of $17,403,303.00; yet on May 1, 1981, Mutschler had given First Bank of North Dakota—Jamestown a financial statement depicting a net worth of only $6,997,000.00 and on June 15, 1981, had given the same bank a financial statement showing a net worth of $6,431,000.00. In April 1982, he gave a financial statement to Wells Fargo Agricultural Credit depicting a net worth of only $4,655,000.00.

The June 1, 1981, financial statement omitted listing a debt to First Bank of North Dakota—Jamestown of $3,140,-000.00; it omitted an indebtedness to GMAC of $100,000.00; it omitted an indebtedness to Commodity Credit Corporation of $1,000,000.00; it omitted an indebtedness to Agra Lease of $100,000.00; it omitted an indebtedness to Commercial Credit Equipment Corporation of $200,000.00; it omitted an indebtedness to General Electric Credit Corporation of $50,000.00; it omitted an indebtedness to Western Savings and Loan of $30,000.00; it omitted an indebtedness to John Deere Company of $150,000.00 to $300,000.00; and finally it omitted an indebtedness to Arizona Bank of $100,000.00. Mutschler at trial offered no satisfactory explanation for these omissions except that they were mistakes on his part or made in reliance on unspecified recommendations from unspecified individuals.

The greatest discrepancy on the statement was with regard to the values placed

on real estate. The statement placed a value of $10,000,000.00 on farm real estate; $533,000.00 on a Jamestown project known as Buffalo Mall; $100,000.00 on a Montana oil well venture; and $2,000,000.00 on the Jamestown Elevator property. The value attributed to the oil well venture was plausible at the time the statement was given due to the fact that drilling had taken place and a strike had occurred. The value given for the Elevator is unrealistic given the fact that no appreciable income was derived from it, and in February 1979 it was depicted as having a negative value of $77,-000.00 in a financial statement given by the Debtors to First Bank—Jamestown. On a February 20, 1980 financial statement given to First Bank of North Dakota, the gross value attributed to the Elevator was only $600,000.00. On the April 1982 statement given to Wells Fargo, it had a value attributed to it of $741,000.00.

The value placed on Mutschler's one-third interest of the Buffalo Mall property was based upon a sale of one lot for $200,-000.00 causing Mutschler to believe the remaining lots were of similar value. An appraisal of the value of this property as of June 1, 1981, was conducted by a recognized real estate appraiser on June 15, 1984. Based upon existing comparables, the appraiser estimated the value of Mutschler's one-third interest to have been in the area of $97,000.00 back in June of 1981. While the financial statement in question was executed June 1, 1981, the sale upon which Mutschler based his evaluation of his Buffalo Mall interest did not even occur until September 1981 and was an exceptionally high price for a very desirable lot. The location and visibility of the other Buffalo Mall lots made them not nearly as valuable. The value attributed to his interest in the Buffalo Mall project was unrealistic and was not based upon prevailing market history or potential existing in June of 1981.

In 1981, the price for farmland was very volatile, yet in May of 1981 Mutschler valued his farmland at $5,184,000.00 and on June 15, 1981, accorded it the same value. There was testimony regarding a June 1, 1981 purchase contract between the Mutschlers and Roy Haddix where the farmland was valued at $12,000,000.00. This caused Mutschler to believe his farm real estate was worth $10,000,000.00 as of June 1, 1981. The Haddix deal, however, had fallen through months before the statement was transmitted to Management Jets, and whether Mutschler actually relied on this sale for land valuation is questionable since neither the May 1981 or June 1981 financial statements given to First Bank of North Dakota—Jamestown reflect a similar valuation. Mutschler also claimed that he relied for his farmland valuation upon Jamestown area real estate purchases by Otter Tail Power Company in 1980. Although some land did sell for in excess of $2,000.00 per acre, this was an extraordinary sale and had no effect on general farmland prices. Furthermore, replacement land purchases made by Otter Tail were acquired at $800.00 per acre, the same price per acre placed on Mutschler's land by appraiser Botsford. Botsford conducted an appraisal of the farmland in April, May and June of 1984 and estimated the total value as of June 1, 1981, less the buildings, to be in the area of $2,661,000.00. Without deciding whether this value is high or low and without arriving at a value for the improvements, it is a fact that the value placed on the land in the June 1, 1981 financial statement is grossly inaccurate. The manager of Norwest Bank—Jamestown also testified regarding land values and, based upon his experience with the Bank and as a former county extension agent, felt the range for Stutsman County tillable land in 1981 was $500.00 to $750.00 per acre.

From the testimony, it is clear that Mutschler has a long history of complicated, large-scale financial dealings. He has prepared financial statements on many occasions for various reasons and knows what information is necessary, the reason for them and what they are to be used for. Over a period of fifteen or so years he has purchased many aircraft on credit and has

provided financial statements as a part of those negotiations.

### 3.

When Management Jets received the statement and the 1979 and 1980 tax returns, their credit manager, Wayne Matthes, did not make a credit check because as dealer, the company had not planned on financing the plane. Matthes knew that Mutschler was initially attempting to obtain financing on his own from Commercial Credit Equipment Corporation. Matthes later learned from Commercial Credit that despite a long history of financing Mutschler aircraft purchases they chose not to finance the purchase of the Cessna Citation, giving no reasons for their decision. Having learned of Mutschler's failure to obtain financing with Commercial Credit, Matthes then contacted CIT who indicated an interest in the deal. Management Jets forwarded the financial statement along with the tax returns to CIT's Omaha office where they were received by Craig Wilkins, a senior credit analysis with the company.

Wilkins, following customary office procedure, commenced a review of the materials sent by Management Jets and then conducted a credit investigation. He testified that his initial reaction to the financial statement was that it was very strong. After a review of the statement, Wilkens proceeded to contact the holders of substantial debt as shown on the financial statement. First National Bank, Travelers Insurance, Metropolitan, MNB, Hector Wallingham and Commercial Credit Equipment Corporation were all contacted, and in each instance Wilkins was advised that Mutschlers were performing well on the respective obligations. None of the parties contacted gave Wilkins any cause to believe that Mutschlers were not completely credit worthy. Regarding Commercial Credit Equipment Corporation's earlier decline of a loan, Wilkins was told only that it had been turned down because of the manner of submission.

Craig Wilkins then proceeded to contact the Jamestown Credit Bureau in Mutschler's hometown and obtained a report over the phone on December 23, 1981. The manager of the Credit Bureau testified that the procedure of his office at that time was to read the credit report identifying various creditors by type only. Mutschler's obligation for First Bank—Jamestown would have been identified as an obligation to "a bank" and the specific identity of the creditor would not have been disclosed unless requested by the party receiving the report. The Bureau employee who gave CIT the credit report on Mutschler testified that she could not recall if she had actually advised CIT of the loan to First Bank of North Dakota. Even if the report had been given to CIT as ordinarily given by the Bureau (at that time), the report would not have disclosed any information which would have called into question the financial statement or the credit investigation done by CIT based on the information contained in the financial statement. Wilkins recalled that the Bureau employee, in response to his request, did not make any mention of the First Bank loan at all but told him that Mutschler's credit was good and something to the effect that Mutschler was the richest man in North Dakota. Given Wilkins' thoroughness in contacting all large creditors listed on the statement, it is highly likely that had CIT been aware of the First Bank of North Dakota—Jamestown loan the Bank would have been contacted. It was not contacted and from this it must be concluded that the Credit Bureau never advised CIT of the existence of that particular debt.

Wilkins made no further investigation into Mutschler's financial background. Although CIT was aware that courthouse and U.C.C. searches could be done and sometimes had been done by their company, such searches were not deemed necessary in the face of a strong financial statement and solid credit reports. CIT personnel had no direct contact with Mutschler himself or with Management Jets prior to closing the loan nor was any direct investigation made to varify the assets as listed on the statement. CIT was aware of the val-

ue of the plane being purchased and was also aware of the amount of the down payment.

Wilkins testified that after receiving very positive credit reports from his investigation he had no doubt at all about the financial statement and was able to recommend that CIT make the loan. He reviewed the tax returns which reflected large losses but did not feel these losses to be substantial in the face of Mutschler's overall financial strength as depicted in the financial statement. CIT's Omaha office then recommended the loan to CIT's regional office in Kansas City based principally upon the financial statement and strong credit references. The regional office also reviewed the financial statement and the tax returns as well as the credit investigation report done by Wilkins. Primary reliance was placed upon the financial statement because it depicted a net worth of $17,403,303.00. In addition, there were seven positive credit references, and the statement itself had no "red flags". The CIT officers from the Omaha and Kansas City offices testified that they discounted the value of the tax returns in face of Mutschler's demonstrated financial strength and there was nothing in the financial statement which raised a question of doubt in any of their minds. Reliance was placed in order of importance on the financial statement, the credit investigation results, the tax returns and, finally, the value of the collateral.

Wilkins, who did the credit investigation for CIT, testified that had he known of the net worth as depicted on the financial statements given to First Bank of North Dakota—Jamestown he would not have recommended the loan to the Kansas City regional office. He also stated that if he had been aware of omissions in the financial statement, the application would have been rejected because of the doubt cast upon the applicant. Joe Pertile, of CIT's Omaha office, also testified that if the net worth from the financial statements given to First Bank of North Dakota had been known to him, the loan would not have been made because the applicant's honesty

would have been impinged. He indicated further credit checks would have been made if the names of the omitted creditors had been known. Given the thoroughness of the credit investigation conducted by CIT, the Court is satisfied that had CIT been aware of the omitted creditors, its investigation would have included them also. R.P. Kraisnch of the CIT regional office testified that to him a $5,000,000.00 discrepancy in farmland value would be considered a material falsehood and, for that matter, any discrepancy would have raised a red flag.

4.

Management Jets as dealer was initially involved with financing only to the extent of locating a finance company, obtaining the financial records from Mutschler and transmitting them to prospective finance companies. When Management Jets received the wire transfer of funds from CIT, it was discovered that they were short by $134,931.15. This discrepancy apparently resulted from a miscalculation in pay-off figures. In discussing this with the Management Jets salesman, John Poffenbarger, Matthes was advised that Mutschler would cover the difference and inquired whether the company might take back a note. Both the credit manager and president of Management Jets stated that taking back notes was an unusual practice for the company and typically would cause them to run a credit check. In the Mutschler situation, however, Management Jets took back a 90-day note on January 8, 1982, without making a credit investigation with one exception. When seeking a possible source of financing, Matthes did have a conversation with Commercial Credit Equipment Company and from them learned that Mutschler had financed a number of planes with them and also learned that so far as CCEC was concerned, Mutschler had a good history. Both the company president and the credit manager for Management Jets stated that in deciding to make the 90-day loan, they placed principal reliance upon the financial statement of June 1, 1981. J. Robert Duncan, the presi-

dent, said that a quick decision was made because the statement was so strong and had they been aware of the land value discrepancy or any of the omitted creditors, the loan would not have been made. Matthes also testified to this effect. Both of these individuals, however, also placed reliance upon what the salesman, John Poffenbarger, had to say. He told them that it was a good deal and that Mutschlers were good people. Before approving the Management Jets loan, Duncan had no contact with Mutschler concerning the financial statement. It is also noted from the facts that as security for the note, Management Jets was to retain and did retain possession of the aircraft on their premises until the note was paid. Furthermore, a $50,000.00 down payment had already been received along with the CIT funding when Management Jets took back the $134,000.00 note.

## CONCLUSIONS OF LAW AND DISCUSSION

### 1.

Before considering whether the Plaintiffs have met their burden of proof relative to section 523(a)(2)(B), the basis upon which CIT predicates its damages will be briefly discussed. Although never raised by the Defendants in their Answer, Mutschler did at trial place considerable weight on the fact that after CIT purchased the plane at the sheriff's sale it later resold it in July 1983 for $240,000.00 more than CIT bid at the sheriff's sale. It is questionable whether this issue is properly before the Court at this time, but because both sides produced evidence bearing on the question, the Court will make several brief comments. Mutschler's argument is to the effect that if CIT is entitled to a judgment at all it should be based upon the $915,000.00 resale figure rather than the price bid at the sheriff's sale. The Court considers the fact of a subsequent resale to be immaterial. The amount of a deficiency is determined as of the date of the sale so long as the sale is conducted in a commercially reasonable manner and the price bid is a fair value. From the facts adduced at trial, the Court is satisfied that CIT did everything it could reasonably do in an effort to obtain the best price possible and afford Mutschler himself an opportunity to make good on his obligation even before the sale took place. From the testimony presented, it was established that the market for small jets of this type had eroded substantially to a point where the wholesale value of the plane in December of 1982 was in the area of $675,000.00. The Defendant did not disagree with this figure and in fact he himself acknowledged at trial that the bottom had fallen out of the market by the time of the sheriff's sale. No evidence was introduced that as of December 7, 1982, a better price could have been obtained. As noted in the case of *Piper Acceptance Corp. v. Yarbrough*, 702 F.2d 733, 735 (8th Cir.1983), "the fact that a better price might have been obtained by a sale at a different time or under different circumstances does not necessarily make a sale commercially unreasonable." *See also C.I.T. Corp. v. Duncan Grading and Const., Inc.*, 739 F.2d 359 (8th Cir.1984). CIT expended considerable effort to be sure that the price bid in at the sheriff's sale was a fair representation of the wholesale value of the plane as of that time. It also took special pain to advertise the fact of the sale in numerous aviation publications of wide circulation. It is entirely fortuitous that some months later CIT was able to resell the plane in a better market climate. At the time of the sheriff's sale, however, there was absolutely nothing to indicate that the sale was unreasonable or that a better price could have been obtained.

### 2.

Section 523 of the Bankruptcy Code provides, in part:

A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

. . . .

(B) · use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B). To have a debt declared non-dischargeable in bankruptcy under 11 U.S.C. § 523(a)(2)(A), the burden is on the plaintiff to prove each of five elements:

1. That the debtor made the representations;

2. That at the time the representations were made he knew them to be false;

3. That the representations were made with the intention and purpose of deceiving the creditor;

4. That the creditor reasonably relied on the representations;

5. That the creditor sustained the alleged injury as a proximate result of the representations having been made.

*See In re Houtman,* 568 F.2d 651 (9th Cir.1978); *In re Vickers,* 577 F.2d 683 (10th Cir.1978); and *Sweet v. Ritter Finance Co.,* 263 F.Supp. 540 (W.D.Va.1967). *See also In re Maier,* 38 B.R. 231 (Bankr.D. Minn.1984). In summary, the proof necessary for a determination of non-dischargeability includes evidence that the debtor made or published a false financial statement with an intent to deceive, that the statement was materially false and that the creditor reasonably relied on the statement to his detriment. *In re Archangeli,* 6 B.R. 50 (Bankr.D.Me.1980). The proximate cause element of section 523 requires simply that the representation of the debtor was the act, without which the creditor would not have suffered the loss complained of.

■ The standard of proof under the foregoing section are to be strictly construed in favor of the debtor with the party objecting to dischargeability carrying the burden of proof on each element. *In re Sutton,* 39 B.R. 390, 397 (Bankr.M.D.Tenn. 1984). The majority of courts require the creditor to prove his case by "clear and convincing" evidence on each of the elements under section 523(a)(2)(B). *See In re Coughlin,* 27 B.R. 632, at 635 n. 7 (Bankr. App. 1st Cir.1983). This is the standard of proof previously adopted by our Court. *See In re Wightman,* 36 B.R. 246 (Bankr. D.N.D.1984).

With this standard in mind, the facts as previously outlined will be measured against the necessary elements of section 523(a)(2).

3.

The first element to be proved is that the allegedly false financial statement is a writing respecting the debtor's financial condition. In order for the writing to be covered by section 523(a)(2)(B), the statement "must either have been written by the debtor, signed by the debtor, or the particular writing must have been adopted and used by the debtor." *In re Goff,* 17 B.R. 564, 567 (Bankr.W.D.Ky.1982); *In re LaRocca,* 12 B.R. 56, 59 (Bankr.W.D.La. 1981). In the present instance, the financial statement in question was intended to be representative of the Debtors' complete financial condition. The statement contains both a listing of the Debtors' liabilities as well as the assets held by the operation. Thus, it is clear that the present financial statement is a writing respecting the Debtors' financial condition. This element has been established as to both Plaintiffs.

4.

■ The second requirement under section 523(a)(2)(B) is that the financial statement be "materially false." It is not sufficient to show that the statement is factually incorrect. *In re Goff,* 17 B.R. at 567. One important issue associated with this element of proof is whether a materially false statement covers omissions as well as

false assertions contained in the financial statement. An overwhelming number of decisions indicated that writings with major omissions may constitute materially false writings. *See First National Bank of Elgin v. Nilles,* 35 B.R. 409 (D.N.D.Ill. 1983); *In re Winfree,* 34 B.R. 879 (Bankr. N.D.Tenn.1983); *In re Biedenharn,* 30 B.R. 342 (Bankr.W.D.La.1983); and *In re Bradford,* 22 B.R. 899 (Bankr.W.D.Okla. 1982). The omission, concealment, or understatement of liabilities constitutes a materially false statement. *In re LaRocca,* 12 B.R. at 59. There is no doubt that the financial statement of June 1, 1981, was false both as to inflated asset values and omitted liabilities. Whether these falsehoods were material must be answered in the affirmative.

■ A recurring definition of a materially false statement is that the falsity is "an important or substantial untruth." *See In re Anderson,* 29 B.R. 184, 191 (Bankr.N.D. Iowa 1983); *In re Magnusson,* 14 B.R. 662, at 668 (Bankr.N.Y.1981). This definition was originally set forth in the decision, *In re Tomeo,* 1 B.R. 673 (Bankr.E.D.Pa.1979), where the court construed the materially false requirement of section 17a(2) of the Bankruptcy Act. The best compilation of all that has been said on material falsity is contained in the decision *In re Denenberg,* 37 B.R. 267 (Bankr.D.Mass.1983). The court in that decision stated, as follows:

> An incorrect or erroneous financial statement is not necessarily materially false. *L. King, Collier on Bankruptcy,* Par. 523–09, at 523–52 (15th ed. Supp. 1982). A materially false statement is one which paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit. *In re Hunt,* 30 B.R. 425, 440 (Bkrtcy.M.D.Tenn.1983). The question of materiality should be judged not on the basis of the size or seriousness or the error, but by a comparison of the debtor's actual financial condition with the picture he paints of it. *In re Valley,* 21 B.R. 674 (Bkrtcy.D.Mass.1982). A fi-

nancial statement which markedly overstates the value of a person's assets, so as to distort his financial picture must be considered materially false. *In re Hunt,* 30 B.R. 425 (Bkrtcy.M.D.Tenn.1983); *In re Tomeo,* 1 B.R. 673 (Bkrtcy.E.D.Penn. 1979).

*In re Denenberg,* 37 B.R. at 271. The requirement of a material falsity is that the financial statement as a whole is found to be a false representation of the over-all financial condition of the debtor. *In re Valley,* 21 B.R. 674, 680 (Bankr.D.Mass. 1982). In this case, the financial statement both grossly overvalued assets and omitted a great deal of liabilities. The Court must find that the financial statement was a materially false statement. This element has been established as to both Plaintiffs.

5.

The third element of proof under section 523(a)(2)(B) is that the debtor intended to deceive the creditor by use of a fraudulent statement. Intent to deceive is a difficult concept and yet a critical element of the necessary proof. Proof of fraudulent intent is not susceptible of direct proof but must be gained from surrounding circumstances. *In re Graham,* 11 B.R. 701 (Bankr.D.Conn.1981). It has been held that a clear pattern of purposeful conduct will support a finding of fraudulent intent. *In re Freudmann,* 495 F.2d 816, 817 (2nd Cir.1974); *In re Saunders,* 37 B.R. 766 (Bankr.N.D.Ohio 1984).

The mere fact that the statement is false and that the debtor knew it was false has been held determinative of an intent to deceive. *In re Rodriguez,* 29 B.R. 537, 541 (Bankr.E.D.N.Y.1983); *In re Coughlin,* 27 B.R. 632, 636 (Bankr.App. 1st Cir.1983); *In re Magnusson,* 14 B.R. at 669. Where the debtor is an individual of intelligence and experience in financial matters, courts have been more inclined to hold him responsible for uttering a false financial statement. *See In re Anderson,* 10 B.R. 607, 608 (Bankr.S.D.Fla.1981) ("The debtor is a well-educated man with no physical or mental impairment."); *Brown v. Hardwick Bank & Trust Company,* 32 B.R. 554, 557–558

(Bankr.E.D.Tenn.1983) (the debtor was a college graduate with a degree in economics and was experienced in obtaining financing and submitting financial statements to lending institutions); *In re Gordon,* 25 B.R. 657, 658 (Bankr.E.D.Tenn. 1982) (debtor was a graduate of a law school and had served as a trust officer with various banks for 14 years); *In re Blatz,* 37 B.R. 401, 404 (Bankr.E.D.Wis. 1984) (debtor was a college graduate with an economics degree who had extensive experience in the fields of real estate, insurance and securities). One decision found requisite intent after considering the debtor's business experience and history of purchasing and leasing aircraft as a tax shelter device. *See In re Coughlin,* 27 B.R. at 636. Mr. Mutschler must be categorized with such individuals. It defies imagination to believe one with the business expertise and financial experience of Mutschler did not intend the dissemination of false information. He is an individual who has in the past completed numerous financial statements and has financed many aircraft purchases. At the time the financial statement was completed, he had knowledge of additional liabilities which were not included on the financial statement. He signed the financial statement and had the financial statement transmitted for the purpose of obtaining financing for the Cessna Citation. At a minimum, Mutschler acted with reckless indifference to the Plaintiffs and it may even be inferred that he specifically intended to deceive whoever might have reason to use the financial statement to obtain financing. This element has been established as to both Plaintiffs.

### 6.

The final element of proof is that of reasonable reliance on the part of the creditors. Reliance, as the term has evolved in connection with section 523 actions, has come to connote not only actual reliance but in addition the concepts of reasonableness and proximate cause.

■ Proximate cause is not, in the tort sense, an independent element of proof but is merely a way of clarifying the causation factor inherent from a complete reading of section 523(a)(2)(B). The preface to the section provides that a discharge does not discharge a debtor from a debt for obtaining an extension of credit *by* use of a false statement. Thus, the statute itself presupposes in the first instance that it was the statement which was the causative factor in the extension of credit, without which the other elements of this section are not even reached. Courts, beginning with *In re Houtman,* supra, clarified this threshold requirement by enumerating it as a separate element of proof. *See also In re Maier,* 38 B.R. 231 (Bankr.D.Minn.1984); *In re Coughlin,* supra; *In re Simpson,* 29 B.R. 202 (Bankr.N.D.Iowa 1983); *In re Fareman,* 7 B.R. 776 (Bankr.D.S.D.1980). Reliance assumes a degree of causation, without which the credit would never have been extended. Courts have held that the reliance on the financial statement need not be an absolute reliance or the sole factor. It is sufficient for section 523 that the proof establish that the reliance on the financial statement was the principal precipitant, the catalyst for the loan, without which the loan would not have been made. *In re Coughlin,* supra. The burden is on the creditor to show by clear and convincing evidence that the financial statement was a significant factor in extension of credit, in the absence of which the extension would not have been made. *See In re Drewett,* 13 B.R. 877 (Bankr.E.D.Pa.1981); *In re Shipley,* 1 B.R. 85 (Bankr.D.Md. 1979). In the instant case, both CIT and Management Jets have claimed reliance on the false financial statement and in fact the testimony establishes that the statement was at least considered by officers of both Plaintiffs. It is the degree of reliance and the effect of that reliance that becomes critical—the causative factor. Before considering whether that reliance rose to the level necessary to meet the causative factor, the composite element of reasonableness will be discussed.

■ While a debtor's intent to deceive is determined with reference to a subjective

standard, the reasonableness of a creditor's reliance on a false financial statement must be determined with reference to objective criteria. *In re Gilman*, 31 B.R. 927, 929 (Bankr.S.D.Fla.1983); *In re Magnusson*, 14 B.R. at 668–669, n. 1. The objective standard relied on by most courts was initially set out in the decision of *In re Patch*, 24 B.R. 563 (Bankr.D.Md.1982). The court in that case stated as follows:

> It appears appropriate, therefore, that the reasonableness of a creditor's reliance on a financial statement should be judged by comparing the creditor's actual conduct with (1) the creditor's own normal business practices, and (2) the standards and customs of the industry, (3) in light of the surrounding circumstances existing at the time the application was made and credit extended.

*In re Patch*, 24 B.R. at 567. *See also In re Furimsky*, 40 B.R. 350, 355 (Bankr.D.Ariz. 1984); *In re Saunders*, 37 B.R. 766, 769 (Bankr.N.D.Ohio 1984).

An issue associated with an examination of the reasonableness of a creditor's reliance is whether the creditor had a duty to make independent inquiries of the debtor's financial condition. Where a financial statement is obviously erroneous from its face, a creditor's reliance has been found unreasonable. *In re Jackson*, 32 B.R. 549, 552 (Bankr.E.D.Va.1983). Thus, a creditor's reliance upon a false financial statement will be unreasonable when that creditor has knowledge that the financial statement is incomplete and inaccurate. *In re Futterman*, 35 B.R. 102, 105 (Bankr.D. Conn.1983); *In re Winfree*, 34 B.R. 879, 885 (Bankr.M.D.Tenn.1983). Where the financial statement is not facially incomplete or inaccurate, then there is no obligation upon a creditor to make an independent check of the applicant's financial condition, unless the creditor's normal business practice dictates that such checks be made in all instances. *In re Vairo*, 40 B.R. 776, 781 (Bankr.S.D.N.Y.1984). There was nothing from the face of the Mutschler financial statement of June 1, 1981, that would point up obvious inaccuracies or give a potential creditor pause as to whether it was accurate or not. Persons receiving financial statements in connection with a loan application are entitled to rely on the statement as being an accurate representation of what it purports to be as long as fraud is not apparent from the document itself. To rule otherwise would render the use of financial statements meaningless and would run contrary to long established business practice regarding their preparation and use. CIT had available to it only the financial statement, and even though it was not patently irregular, a complete check of the statement's information was made. Conducting a credit check was the usual practice for CIT and it was also the usual practice for Management Jets in those unusual situations where a note was taken back. While perhaps prudent to conduct a credit check, such a check is not mandatory where the financial statement itself does not raise "red flags" indicating irregularities. Furthermore, in the present instance, a credit check would have served no purpose because it would not have revealed the inaccuracies or omissions and probably would have left a creditor with a false impression of honesty on the part of the Debtor. To the degree CIT and Management Jets relied on the statement, that reliance was reasonable.

Reasonable reliance has been established by both Plaintiffs. Now we must return to the causation factor which perhaps is the most difficult issue since we must now address the question of whether that reliance on the part of each Plaintiff was the precipitating cause in the extension of credit by the respective Plaintiff.

With regards to CIT, the Court is satisfied the financial statement was not only the principal factor but the only factor employed by it in its decision to extend credit to Mutschler. CIT had no other information other than the information given to it by Mutschler. The Court is satisfied that but for the financial statement, CIT would not have made the loan.

Management Jets was a seller of aircraft, not normally involved in their fi-

nance. It never intended to finance the Cessna purchase but became involved only secondarily after the purchase contract had already been signed and financing had been arranged through CIT. Management Jets' principal objective was to sell the plane. Obviously, after having received a financing commitment from CIT for over $1 million, the last thing Management Jets wished was for the deal to fail because of a rather minor discrepancy in the funds transferred to it from CIT. It had already taken in two aircraft in trade and had received $50,000.00 down payment. Although the company witnesses stated that they made a quick decision to take back a note based on the strong financial statement, this claim ignores the realities that existed at the time. Management Jets' saleman, John Poffenbarger, had opined that Mutschlers were good people and that Mr. Mutschler would personally take care of the $134,900.00 difference. Armed with the salesman's encouragement, CIT loan funds in excess of $1 million, a $50,000.00 down payment, two trade-in aircraft and retention of possession of the plane itself, it is hard for the Court to imagine that much reliance was placed on the financial statement by Management Jets in their election to take back a 90-day note in order to preserve the deal. From the entirety of the circumstances as existing at the time of the extension of credit by Management Jets, it does not appear by clear and convincing evidence that reliance on the financial statement was the cause of Management Jets' decision to make the $134,900.00 loan. With regard to this last element, Management Jets has not carried its burden.

Accordingly, and for the reasons stated herein,

IT IS ORDERED that the deficiency owing C.I.T. Corporation in the sum of $640,-860.84 plus interest from October 4, 1984, at the per diem rate of $233.55 is non-dischargeable under section 523(a)(2)(B);

IT IS FURTHER ORDERED that the indebtedness to Management Jets Interna-

tional, Inc. is discharged and the Complaint of Management Jets is dismissed.

IT IS FINALLY ORDERED that costs and attorneys' fees are denied to all parties.

LET JUDGMENT BE ENTERED ACCORDINGLY.