In re John A. KROH, Jr., Debtor.

CAPITAL CITY BANK & TRUST, Plaintiff,

v.

John A. KROH, Jr., Defendant.

Bankruptcy No. 87–00389–1–11.
Adv. No. 87–0229–1–11.

United States Bankruptcy Court, W.D. Missouri, W.D.

June 23, 1988.

Frank P. Barker, III, and Robert A. Pummill, Kansas City, Mo., for plaintiff.

F. Stannard Lentz, Mission, Kan., for defendant.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

KAREN M. SEE, Bankruptcy Judge.

Plaintiff Capital City Bank & Trust (the "Bank") seeks nondischargeability of the debt of John A. Kroh, Jr. pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(2)(B). At trial, plaintiff appeared by counsel Frank Barker, III and Robert Pummill and by representative Del Weidner. Defendant appeared by counsel F. Stannard Lentz and Darrell McGowen. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B) and (I) and venue is proper pursuant to 28 U.S.C. § 1409. After considering the evidence, the Court makes the following findings of fact and conclusions of law based on proposed findings and conclusions submitted by plaintiff. To the extent findings of fact constitute conclusions of law or vice versa, they shall be so construed.

Additionally, pursuant to Rule 201(f), F.R.Evid., the Court takes judicial notice of the following: 1) the Findings of Fact, Conclusions of Law and Judgment, entered on June 13, 1988 by the undersigned in *Firstate Savings and Loan v. John A. Kroh, Jr.*, Adversary No. 87–0108–1–11 and *Firstate Savings and Loan v. George P. Kroh*, Adversary No. 87–0107–1–11, which were consolidated for trial; 2) the Findings of Fact, Conclusions of Law and Judgment, entered on June 16, 1988 by the undersigned in *Kansas National Bank and Trust v. John A. Kroh, Jr.*, Adversary No. 87–0184–1–11 and *Kansas National Bank and Trust v. George P. Kroh*, Adversary No. 87–0185–1–11, which were consolidated for trial; and 3) the Findings of Fact, Con-

clusions of Law and Judgment, entered on June 13, 1988 by the undersigned in *Norbank v. John A. Kroh, Jr.*, Adversary No. 87–0407–1–11. The decisions in those cases shall be made a part of the record in this proceeding, and the findings and conclusions from those decisions are adopted herein.[1]

 Finally, the Court also notes that John's counsel asserted, in pre- and post-trial filings, that John could not properly defend himself in this action because of his invocation of the Fifth Amendment privilege against self incrimination. However, a party cannot avoid trial because they choose to invoke the Fifth Amendment. Moreover, there was no invocation of the Fifth Amendment by John at trial and his answer did not invoke the Fifth Amendment. In view of these facts, the fact that similar circumstances occurred in other nondischargeability proceedings, and the fact that John filed Schedules and Statements of Affairs in his main case, any assertion that John has clearly and consistently invoked the Fifth Amendment in this case is without merit.

## FINDINGS OF FACT

On or about August 13, 1986, Del Weidner and Matt Sabatini met with John A. Kroh, Jr. at the headquarters of Kroh Brothers Development Company ("KBDC") in Kansas City, Missouri. Del Weidner is general counsel to and a trust officer of Capital City Bank, located in Topeka, Kansas. Matt Sabatini is an officer of the Bank. At all times relevant to this case, KBDC was a large, nationwide real estate development company operating along with other related entities, all of which were headquartered in Kansas City, Missouri. KBDC had a national reputation and was very well known in the Kansas City and regional area. John A. Kroh, Jr. is also known as Jack Kroh. He and his brother George P. Kroh each owned 50% of KBDC.

The primary purpose of the August 13, 1986 meeting was to solicit and to encourage KBDC to purchase, lease or manage Mr. Frank Sabatini's properties located in the Topeka area. Frank Sabatini is the owner and chairman of the board of the Bank and owns and operates other business properties located in the Topeka, Kansas area including an office building.

During the meeting, John made a request for personal loans for himself and his brother. John told Weidner that he and his brother occasionally needed personal loans in order for them to make personal investments or to take advantage of personal investment opportunities. John stated that he and his brother had to act quickly when personal investments presented themselves and that he wanted to establish open lines of credit for each brother at the Bank. He indicated that the funds were normally paid back within a week to a month from the time the brothers drew down on the loans. John also told Weidner that he had similar lines of credit established at other banks. John asked Weidner what Capital City Bank's lending limit was, and was told $400,000. John asked if the loan limit was $400,000 for each brother or for both brothers and was told by Weidner that the limit would apply to each loan separately.

John also represented to Weidner that KBDC was a very successful company; that it was very profitable; all of KBDC's projects were profitable; and that none of KBDC's projects operated at a loss. John delivered to Weidner a black pouch which contained, among other things, a 1985 audited financial statement of KBDC prepared by Francis A. Wright and Company.

---

1. The Court emphasizes that its decision in this case is supported by clear and convincing evidence in the record in this case. The findings and conclusions, in the other, similar nondischargeability actions, of which the Court has taken judicial notice, are merely further evidence of John's intent to defraud. They demonstrate the enormity of his scheme to intentionally and fraudulently misrepresent his financial condition to numerous lenders in order to obtain millions of dollars in loans within a short period of time. Furthermore, although here the evidence is clear and convincing, it is noted that recent authority indicates the applicable standard of proof for § 523 actions may only be preponderance of evidence. *Henson v. Garner*, 73 B.R. 26 (Bankr.W.D.Mo.1987), *aff'd in unreported opinion*, No. 87–0434–CV–W–1 (W.D.Mo. 2/29/88).

811

The black pouch contained an organizational chart of KBDC, several documents marked "Confidential" showing KBDC's projects and their financial status, and several real estate appraisals concerning those projects. It also contained various promotional and advertising materials relating to the projects, including a listing of KBDC's projects and glossy pictures of several of them. John went over the contents of the black pouch, project by project, and stated that all of the projects were more than 90% occupied, that all projects were successful and carried their own weight and were making a profit for KBDC. During the meeting, John made no statements regarding KBDC's financial difficulties and its failure to generate sufficient operating cash.

Weidner requested personal financial statements of John and George. John called his secretary on the intercom and requested her to bring them in, which she did, and gave them to John. He then gave them to Weidner. Weidner gave George's financial statement to Sabatini and then looked at John's financial statement. Weidner remarked that the statement was dated August 15, 1986. John replied that the date was a typographical error, that the financial statements were on the computer and that they were currently updating the financial statements. John called in his secretary, asked her to change the date on the financial statement and told her to put the date of June 1, 1986 on his financial statements. The secretary changed the date and returned the financial statements to John who gave it back to Weidner. John then signed his financial statement and dated it July 13, 1986, in the presence of Weidner. John stated that the financial statement was current and accurate as of the date of the meeting, August 13, 1986. John also told Weidner that a Mr. Gilchrist, Vice President of Finance for KBDC, would be the contact for the personal loans and that if Weidner had any questions he should call Gilchrist.

The financial statement consisted of a balance sheet (page 1), a list of stocks and investment partnerships (page 2), a signature page (page 3) and a list of lines of credit (page 4). The written personal financial statement and balance sheet of John represented assets totalling $21,415,-299, liabilities of $3,300,000, and a net worth of $18,115,299. Page 1 of the financial statement stated total liabilities of $3,300,000 called "bank debt." Page 4 is a specific list of lines of credit which itemized eight loans totaling 2.9 million dollars.

After the meeting, Weidner and Sabatini were taken on a tour of the KBDC offices located at 8880 Ward Parkway, Kansas City, Missouri. The tour included a tour of the corporate offices, George's office, and certain other departments within KBDC. They then toured some of KBDC's projects and properties, including a tour of the Hall Farm project. The tours of the elaborate offices and various properties all reinforced the impression made by the balance sheet and John's statements.

Upon returning to Topeka, Weidner prepared loan memoranda which included information received at the meeting, as well as information from John's personal financial statement. He put information contained in John's personal financial statement into the loan memo in at least two different places. The purpose of the loan memo was to inform members of the Loan Committee and/or the Discount Committee, in written format, as to who was requesting the loan and the requested loan amount. It contained pertinent information regarding the financial status of the borrower and other information known to the loan officer that would be important to the decision to make the loan.

Mr. William E. Drenner is an advisor to Frank Sabatini, a director for the Bank and a member of the Discount Committee of the Bank. He reviewed the information contained in the black pouch and prepared and circulated a written summary regarding its contents to the members of the Loan Committee and the Discount Committee.

The Loan Committee consists of the Bank's loan officers (including Weidner) and Frank Sabatini. The Discount Committee is made up of Weidner, Frank Sabatini,

two independent directors for the Bank and the Bank president. Each of the members of the Discount Committee reviewed Weidner's loan memo, John's financial statement and Drenner's memo. Weidner also made an oral presentation to both Committees. The Discount Committee did not act on the loan requests at the regular meeting. Instead, the Committee met again in a special session. The loan request was ultimately approved in the amount of $400,000. Additionally, Frank Sabatini made telephone inquiries to banking contacts located in the Kansas City area that were familiar with John, George and KBDC.

On August 26, 1986, George Gilchrist (acting at Jack's request) telephoned Weidner regarding the loan and stated that Jack and George had a personal investment opportunity that they wanted to take immediate advantage of and that they wanted to act upon it quickly. Weidner told Gilchrist the Bank had approved loans to both brothers in the amount of $400,000 each and they could draw down on them as soon as the loan documentation was prepared and signed.

Gilchrist testified that he understood that the loan proceeds from the Capital City Bank loans would be used by the brothers for personal investment or business investment opportunities, although he did not recall stating that to Weidner. Gilchrist instructed Weidner that the loan proceeds should be wire transferred to John's personal bank account at the Mercantile Bank.

Accordingly, Weidner sent by Federal Express overnight delivery the promissory notes for the loans to Gilchrist. John signed a promissory note in the amount of $400,000 in favor of the Bank on August 28, 1986 and paid a $6,000 commitment fee in September, 1986. He made interest payments on the loan for the months of October and November. John did not use the $400,000 loan proceeds for personal investments, as he represented to the Bank, but rather he deposited them in KBDC's corporate account although the exact date of that deposit is undetermined.

John was a director of a major bank located within Kansas City, Missouri. He also owned substantial interests in at least three banks. He is knowledgeable about banks and banks' lending procedures. He is a sophisticated businessman, knowledgeable about the power of numbers, the use of a balance sheet, and the meaning of the entries upon the balance sheet. He was also an insider of KBDC within the meaning of 11 U.S.C. § 101(30).

John orally made the following misrepresentations to Weidner at the August 13, 1986 meeting: 1) that the loan proceeds would be used for personal investments when actually he knew that any loan proceeds would be used for KBDC; that KBDC was profitable and successful when actually as an insider he knew they were experiencing extreme cash flow difficulties; and that KBDC's projects were profitable. He also misrepresented, in writing, his personal financial condition by use of the financial statement given to Weidner.

The bank debts of John reflected on Exhibit 71, and the CitiBank debt of $1,250,-000 (not on Exhibit 71) were in fact the actual bank debts of John as they existed on August 28, 1986. The CitiBank debt of $1,250,000 was in fact incurred by John in August, 1985, as disclosed on John's signed Bankruptcy Schedules of Assets and Liabilities. John had 31 outstanding bank loans existing as of the end of July, 1986, not eight as represented by the financial statement given the Bank. John's actual bank debt exceeded $3.3 million dollars (the amount represented to the Bank in August, 1986) as of August 1, 1985, more than one full year prior to the time the Bank made its loan to John. John's actual bank debt as of the end of May, 1986, was $7,144,682 ($5,894,682.00 from Exhibit 71 plus the $1,250,000 debt to CitiBank). Making a percentage computation as of the end of July, 1986, John disclosed to the Bank only 38% of the actual outstanding bank loans as of that date. Making a percentage computation as of the end of May, 1986, John disclosed to the Bank only 46% of the actual debt outstanding.

John's attorney argued that the $1,250,000 included as bank stock loans in the asset portion of the financial statement should be added to the $3.3 million in bank debt. Even assuming that, the debt disclosed on the financial statement—$4,550,000—is still only 53%, or just over half of the actual bank debt that in fact existed as of July 31, 1986. Making the same calculation with the actual debt as of the end of May, 1986, the debt disclosed is only 64% of the actual debt on that date.

Additionally, the evidence showed escalating debt in the short time before the Bank's loan was made. John's outstanding bank debt grew at a rapid pace during 1986. It grew $475,000 in January, 1986; $100,000 in February, 1986; $500,000 in March, 1986; $750,000 in April, 1986; $1,048,112 in May, 1986; $450,000 in June, 1986; and $1,050,000 in July, 1986. In the first seven months of 1986, John personally borrowed over $4.3 million dollars. In addition to the Bank's $400,000, John borrowed $507,000 in August, 1986.

Weidner testified that the primary reason the Bank made the loan was because of the financial statement. The following facts support this testimony. First, John represented that the financial statement was currently being updated during the August 13 meeting. Weidner had no reason to doubt that John was an honest man during August, 1986. Second, Weidner used John's financial statement in compiling his loan memo and the Loan and Discount Committees reviewed the memo in approving the loan.

Third, the financial statement had no inconsistency on its face and it appeared to be a reliable document under the circumstances in which it was delivered. It contained nothing within its four corners that indicated that additional investigation would be required, or that any of the information therein should have been verified. The statement and its attachments appear to be complete on their face and the information contained within the statement appeared to the Bank to be sufficient information to obtain an accurate picture of John's then existing financial condition.

The Bank did not know in August, 1986, nor did it have any reason to believe that the financial statement of John was false. It had no information in its possession that conflicted with any of the information contained in John's financial statement. John neither alleged nor offered proof that had the Bank further investigated the information contained within the financial statement that conflicting information or other debts would have been revealed. Moreover, John, through Gilchrist, rushed the loan transaction, which cut short the time for the Bank to do further investigation. Weidner also testified that had he known of the 31 bank loans totalling more that $8.5 million as of the end of July, 1986, the Bank would not have made the loan to John.

Within six months after John requested the loan and made the above representations, an involuntary Chapter 7 was filed against him on January 29, 1987 and he was adjudicated bankrupt. Shortly thereafter on February 13, 1987 KBDC and a number of its related entities filed for Chapter 11 protection.

John did not testify at trial. The Court notes that in pre- and post-trial filings John, through counsel, indicated that he could not properly defend himself in this action because of his invocation of the Fifth Amendment privilege against self-incrimination. Counsel further asserted that the Court should not draw an adverse inference from John's invocation of the privilege. However, a party cannot avoid trial because they choose to invoke the Fifth Amendment. Moreover, there was no invocation of the Fifth Amendment by John at trial and his answer did not invoke the Fifth Amendment. In view of these facts, the fact that similar circumstances occurred in other nondischargeability proceedings, and the fact that John filed Schedules and Statements of Affairs in his main case, any assertion that John has clearly and consistently invoked the Fifth Amendment in this case is without merit and the Court does not consider it to be at issue in this case.

## CONCLUSIONS OF LAW

Congress established the fraud exception to discharge to discourage fraudulent conduct and to ensure that the relief intended for the honest debtor does not benefit the dishonest. *Jennen v. Hunter*, 771 F.2d 1126, 1130[4] (8th Cir.1985). When dishonesty is demonstrated with respect to a specific debt, the debtor is not entitled to the benefit of the debtor rehabilitation policy considerations of the bankruptcy code. *Hunter*, 771 F.2d at 1130[3]; *Thul v. Ophaug*, 827 F.2d 340, 343 (8th Cir.1987). However a creditor seeking to declare a debt nondischargeable under these sections has the burden of proving each element by clear and convincing evidence. *Matter of Van Horne*, 823 F.2d 1285, 1287[1] (8th Cir.1987). Based on the evidence adduced at trial and for the following reasons, judgment will be entered in favor of the Bank.

■ The Bank seeks nondischargeability of John's debt in the amount of $400,000 under §§ 523(a)(2)(A) and (a)(2)(B). Because the Court concludes that the debt is nondischargeable under § 523(a)(2)(B), it makes no conclusions concerning the nondischargeability of the debt under § 523(a)(2)(A).

Under 11 U.S.C. § 523(a)(2)(B) a debt is nondischargeable if obtained by a written statement:

(i) that is materially false;

(ii) respecting the debtor's ... financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive[.]

All of the elements of this section have been met.

■ First, a financial statement is materially false if it, as a whole, is found to be "a false representation of the overall financial condition of the debtor." *In re Mutschler*, 45 B.R. 482, 491[6] (Bankr. N.D. 1984). A financial statement with major omissions may be considered as containing a materially false representation. *Id.* John's financial statement was materially false in both of the above respects. The statement grossly overstated his net worth and grossly understated his bank debt. This is true whether the statement is viewed on June 1, 1986, July 13, 1986, or August 13, 1986. These misrepresentations were fraudulent and produced a financial statement that falsely represented John's overall financial condition. Moreover, a correct financial statement would have shown a pattern of rapidly escalating debt, highly relevant to a bank's determination of a borrower's credit worthiness.

■ Second, the Bank reasonably relied on the financial statements. When evaluating a creditor's reliance on financial statements, courts should be mindful of the danger of slipping into a review of the creditor's business judgment instead of focusing on whether it was reasonable for the creditor to rely on the debtor's misrepresentation. *McMillan v. Firestone*, 26 B.R. 706, 718 (Bankr.S.D.Fla.1982). Reasonable reliance comports with a bank's normal business practice. A bank should not be required to exceed its own internal policies before it will be deemed to have reasonably relied upon the financial statement of a debtor. *In re Esposito*, 44 B.R. 817, 825 (Bankr.S.D.N.Y.1984); *accord Mutschler*, 45 B.R. at 493. When a creditor's reliance is at issue under § 523(a)(2)(B) the court should examine the following:

'[T]he creditor's standard practices in evaluating loan applications; industry standards; and particular circumstances existing when the financial statement is presented ... [Reasonableness] should be viewed as a test of credibility. Reasonableness is not, with respect to the victim of an intentional tort, a framework of legal standards fashioned from an affirmative duty.'

*Matter of Earls*, 80 B.R. 978, 980 (W.D.Mo. 1987), *quoting In re Richards*, 71 B.R. 1017, 1022 (Bankr.D.Minn.1987). An independent investigation is not necessary. *Id.* Additionally, the primary purpose of the reasonable reliance requirement of § 523(a)(2)(B) was to prevent unscrupulous creditors from inducing debtors to falsify

financial statements for the purpose of later using them to object to the debtor's discharge. *In re Ophaug*, 827 F.2d 340 at 343; *In re Fosco*, 14 B.R. 918 at 921–922 (Bankr.D.Conn.1981); H.R.Rep. No. 595, 95th Cong., 1st Sess. 130–131 (1977) U.S. Code Cong. & Admin. News 1978, pp. 5787, 6091, 6092.

Here, the Bank relied on the statement. Weidner testified that the primary reason the Bank made the loan was on the basis of the financial statement. He also testified that the Bank would not have made the loan had the statement accurately stated the enormity of John's bank debt. The question, then, is whether the Bank's reliance on the statement was reasonable.

John argues that the Bank's reliance cannot be reasonable because it did not follow its internal lending policies in making the loan. Those policies require a check on the borrower's previous payment record, a credit check, and a financial spread on the financial statement of the borrower. The Court disagrees and holds that the Bank's reliance was reasonable for the following reasons. First, John, through Gilchrist, rushed the loan transaction, which cut off the time which the Bank had to do further investigation. Under these circumstances, John cannot take advantage of the shortened time for the Bank to investigate his financial condition because he requested the money immediately. Second, a bank is entitled to rely on the contents of a financial statement, especially "when the provider of the financial statement is a professional person." *In re Rodriguez*, 29 B.R. 537, 540[5] (Bankr.E.D.N.Y.1983). Unquestionably John is a man of intelligence and a "professional person" in the field of real estate development and finance. Third, John said that the financial statement was current, and the transaction in his office on August 13 indicated that the financial statement was in the process of being updated. The law presumes that until there is a reasonable ground to believe otherwise, a presumption prevails that men will be honest in their dealings with others. *Matter of Garman*, 643 F.2d 1252, 1260 (7th Cir.1980), *cert den'd, Garman v. Northern Trust Co.*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981). A creditor is not required to suspect fraud in every transaction. *Rogers v. Hickerson*, 716 S.W.2d 439, 446 (Mo.Ct.App.1986); *Selle v. Wrigley*, 116 S.W.2d 217, 225 (Mo. Ct.App.1938). In fact, under the circumstances to require Weidner to assume at that time that John was not an honest man would certainly place an unfair burden on the Bank.

Moreover, the statement was complete on its face, had no inconsistencies and contained nothing indicating that additional investigation would be required, or that any of the information should be verified. The information contained within the statement appeared to the Bank to be sufficient information to obtain an accurate picture of John's then existing financial condition. There was no evidence that the banking community was aware of KBDC's financial situation at the time the loan was made. When a financial statement, on its face, contains no information requiring further investigation and there is no evidence that a further investigation would have uncovered inaccuracies in the financial statement, the creditor's reliance upon the financial statement is reasonable. *Matter of Garman*, 643 F.2d 1252, 1259–1260 (7th Cir.1980); *In re Vairo*, 40 B.R. 776, 781 (Bankr.S.D.N.Y.1984); *In re Winfree*, 34 B.R. 879, 885 (Bankr.M.D.Tenn.1983); *Mutschler*, 45 B.R. at 493.

■ Finally, John had knowledge of facts and circumstances affecting this issue and failed to testify on his own behalf. This raises a strong presumption that his testimony would have been unfavorable to him. *Spaeth v. Larkin*, 325 S.W.2d 767 (Mo.1959); *Block v. Rackers*, 256 S.W.2d 760 (Mo.1953). These facts lead the Court to conclude that the Bank complied with its standard practices in evaluating loan applications to the extent time permitted. Under the circumstances existing when the financial statement was presented to Weidner, given the fact that the loan was approved by the appropriate committees and considering the absence of any facial inconsistencies in the financial statement, the

Court holds that the Bank's reliance was reasonable.

 The final elements are John's intent to deceive the Bank and proximate cause. Because subjective intent to deceive is virtually incapable of direct proof it must be inferred from all circumstances surrounding the transaction. *Mutschler*, 45 B.R. at 491. Additionally, when a debtor is an individual of intelligence and experience in financial matters, the mere fact that a financial statement is false and that it is known to be false is sufficient to establish an intent to deceive. *Mutschler*, 45 B.R. at 491; *Rodriguez*, 29 B.R. at 541. The evidence in this case and in other dischargeability decisions involving John, of which this Court took judicial notice, show by clear and convincing evidence that John engaged in a deliberate scheme to obtain loans from the Bank and other lenders by using a materially false financial statement. This scheme is clearly shown by the number of loans John procured for himself and his brother in a relatively short period of time during 1986. *See*, Exhibit 71; *Firstate Savings and Loan v. John A. Kroh, Jr.*, Adversary No. 87–0108–1–11, Findings and Conclusions (6/13/88); *Firstate Savings and Loan v. George P. Kroh*, Adversary No. 87–0107–1–11, Findings and Conclusions (6/13/88); *Kansas National Bank and Trust v. John A. Kroh, Jr.*, Adversary No. 87–0184–1–11, Findings and Conclusions (6/16/88); *Kansas National Bank and Trust v. George P. Kroh*, Adversary No. 87–0185–1–11, Findings and Conclusions (6/13/88); *Norbank v. John A. Kroh, Jr.*, Adversary No. 87–0407–1–11, Findings and Conclusions (6/13/88). All these circumstances lead to the firm conclusion that John furnished the financial statement to the Bank with the intent to deceive the Bank in order to obtain credit from the Bank. Concerning the proximate cause element, the Bank has been damaged in the amount of $400,000 as a proximate result of John's intentionally false misrepresentations. For these reasons the Court holds that John's debt to the Bank is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B). Judgment should be entered against John and in favor of the Bank for $400,000.

Accordingly, for the foregoing reasons, it is hereby ORDERED ADJUDGED AND DECREED as follows:

Judgment is entered in favor of plaintiff and against defendant John A. Kroh, Jr. for $400,000. The judgment is excepted from discharge and declared nondischargeable in bankruptcy pursuant to 11 U.S.C. § 523(a)(2)(B).