In re David B. KERBAUGH and Mary K. Kerbaugh, Debtors.

Rick VANGELISTI, Plaintiff,

v.

David B. KERBAUGH, Defendant.

Bankruptcy No. 92–31237.
Adv. No. 93–7027.

United States Bankruptcy Court,
D. North Dakota.

Sept. 23, 1993.

Clifton G. Rodenburg, Fargo, ND, for plaintiff.

Charles Chinquist, Fargo, ND, for defendant.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The plaintiff-creditor, Rick Vangelisti (Vangelisti), commenced the above-entitled adversary proceeding by complaint filed April 6, 1993, seeking a determination that a state court judgment entered against the debtor, which arose from a default by the debtor on a loan, was nondischargeable pursuant to section 523(a)(2)(B) of the Bankruptcy Code. Vangelisti further seeks the recovery of costs incurred in connection with this action. The defendant-debtor, David B. Kerbaugh (Kerbaugh), generally denies the allegations set forth in the complaint.

Trial was commenced on August 23, 1993 and lasted two days. From the evidence presented and arguments made, the court finds the facts set forth herein material to the resolution of this case and makes the following conclusions of law:

### FINDINGS OF FACT

1.

The defendant-debtor, David B. Kerbaugh, is the holder of a bachelor's and master's degree in education as well as a doctoral degree in higher education. He is currently employed as the Chief Executive Officer of the Mother of God Monastery in Watertown, South Dakota and has held that position for some time. The position provides Kerbaugh with administrative oversight responsibilities and direct authority over the financial affairs of the institution. Kerbaugh has held substantial executive positions with and engaged in consulting for a number of private colleges over the years, specializing in assisting financially troubled colleges return to profitability. To say the least, Kerbaugh's background and experience appears demonstrative of an individual who is not unsophisticated in the area of finance.[1]

Sparked by a concept pursued by his brother in Oregon through a corporation known as J & J, Inc., which operated essen-

---

**1.** Although Kerbaugh testified that he was not fully knowledgeable in all areas of finance, he did profess to have an "expertise" in some areas of finance.

tially as an independent sales organization for credit card transactions, Kerbaugh started a company based in Fargo, North Dakota called Great Plains Financial Services, Inc. This new company was incorporated on March 28, 1990 and was designed, in part, to place credit card processing services for businesses unable to otherwise obtain merchant agreements with processing banks and credit card issuers.

In the summer of 1990, plans for implementing Kerbaugh's vision were already well underway. By making various promises, one of which included stock ownership, Kerbaugh recruited his brother, Keith Kerbaugh, David Hughes, and James Sullivan to assist in the promotional and operational aspects of the venture.[2] In an effort to procure business and financing for Great Plains Financial Services, Inc. (GPFS), Kerbaugh spent a considerable amount of time traveling and making presentations to the decisionmakers of various financial institutions and potential investors. Additionally, Kerbaugh specifically directed James Sullivan (Sullivan) to assist in the procurement of investment capital for the enterprise.

Sullivan contacted the plaintiff, Rick Vangelisti, who happened to be a long-time friend and associate, and briefly informed him of the investment opportunity available with GPFS. Based on their relationship, Vangelisti agreed to accept a meeting with Kerbaugh to discuss the possibility of investing in the company. In November of 1990, the parties met in California whereupon Kerbaugh unveiled his business concept with great particularity and presented Vangelisti with a copy of a detailed business plan for GPFS which consisted of, among other things, pro forma income statements, statements outlining the sources and uses of capital, a balance sheet dated July 15, 1990, as well as a notation that his long-time friend and associate was a stockholder of the company.[3] Kerbaugh led Vangelisti to conclude that the company was, for the most part, fully operational and that the funds from the Vangelisti investment were going to be utilized primarily for the acquisition of equipment.

Over the course of the next month, the parties and their respective attorneys engaged in a series of extended discussions and negotiations concerning the contents of the business plan and the loan arrangement. Vangelisti immediately consulted Richard Seim (Seim), an attorney experienced in corporate and tax law, who examined the business plan in order to make an assessment of the company. Seim spent a considerable amount of time evaluating the financial profile of GPFS. Specifically, he examined various operational projections, sources and uses of capital, and the balance sheet, all of which were contained in the business plan, and determined that the information presented compelled the conclusion that the company had already acquired significant amounts of capital and had substantial assets which would be adequate to secure the Vangelisti investment. Since the balance sheet contained in the business plan was nearly six months old at the time, Seim contacted Kerbaugh's attorney, Ed Vinje (Vinje), in order to ascertain if there had been any significant changes in the corporation's balance sheet picture. Vinje assured Seim that the balance sheet picture hadn't markedly changed in the last six months. Additionally, Seim had some questions regarding whether or not Kerbaugh had been able to obtain the rest of the funding that was called for by the business plan. In response, Vinje sent Seim a document via facsimile that was prepared by Kerbaugh which demonstrated that Kerbaugh had succeeded in obtaining the requisite funding from another source.[4]

Relying on Kerbaugh's assertions and the ostensible strength of the business

---

2. The promises of stock ownership later proved to be hollow as not one single share of stock was ever issued despite the fact that the company's articles of incorporation authorized 100,000 shares of common stock.

3. The evidence indicated that Kerbaugh had prepared and utilized a number of different business plans in connection with GPFS.

4. Despite the facsimile, the evidence revealed that Kerbaugh never obtained the additional funding that the business plan indicated was required.

plan, Vangelisti entered into financial negotiations with Kerbaugh which culminated in the signing of a collateralized loan agreement and the subsequent advancement of funds which is the underlying basis for the instant action.

## 2.

### *The Loan*

The loan was in the amount of $50,000.00 and was disbursed by Seim directly to Kerbaugh in his office in California on January 7, 1991. Prior to disbursement, Seim spent some time discussing the business plan with Kerbaugh whereby Kerbaugh confirmed his previous indication that he had been able to procure the remainder of the funding that the business plan indicated was required.

The loan agreement signed by the parties provided in part:

### BUSINESS PLAN

5.(a) GPFS has supplied Creditor with a copy of its 1990 business plan. A copy of the portion of that plan entitled "Financial Plan" is attached. Creditor acknowledges that the business plan is GPFS's projection of future results, which may or may not be achieved. GPFS represents that the plan represents GPFS's sole current intentions regarding the conduct of its business, and *GPFS knows of no information which tends to contradict the projections or feasibility of the plan. GPFS acknowledges that Creditor will rely, and is entitled to rely, on the truth of the factual matters stated in the business plan,* and the diligence, expertise, and good faith of GPFS and its directors, officers and shareholders in making the

projections and drawing the conclusions stated in the business plan.

(b) The business plan calls for a total funding in excess of the amount being supplied by Creditor. GPFS specifically represents that is has acquired sufficient funds, in addition to those supplied by Creditor, to carry out the business plan. (Plaintiff's Exhibit 2, ¶ 5 at 3) (emphasis added). The loan agreement further provided:

Any litigation between Creditor and GPFS regarding this agreement, the circumstances surrounding it, or the representations and negotiations preceding it, shall be conducted in Santa Clara County, California. The prevailing party in any such litigation shall be entitled to recover reasonable attorney fees and costs, including fees and costs for enforcement of the judgment.

(Plaintiff's Exhibit 2, ¶ 6(b) at 4).

A security agreement, executed by Kerbaugh as President of GPFS in connection with the loan agreement and promissory note, purported to pledge specifically enumerated assets of the corporation and contained an after-acquired property clause.[5] The debtors, David and Mary Kerbaugh, *both* signed an unlimited personal guarantee in connection with the loan, as did others. A form UCC–1 financing statement evidencing the collateral pledge was signed by Kerbaugh and recorded with the Secretary of State of North Dakota on January 14, 1991.

## 3.

### *The Business Plan*

The business plan for GPFS was essentially the equivalent of a prospectus that represented an ongoing business operation.[6] Although no corporate stock was ever issued, the business plan identified Keith Kerbaugh, Mary Kerbaugh, Dave Hughes, and James Sullivan as the corporation's stockholders.

---

**5.** The collateral pledged as security for the loan as set forth in the security agreement had an aggregate listed value of $33,100.00 and consisted of the following: ITT phone system, folding machine, typewriter, office support machines, desks, chairs and tables, Apple MacIntosh computer system, IBM System and other miscellaneous items. In the security agreement, Kerbaugh specifically warranted that GPFS "is and will be

the absolute owner of the Collateral." (Plaintiff's Exhibit 2, ¶ 2 at 2).

**6.** Although the business plan was not copied in its entirety, testimony of Keith Kerbaugh revealed that portions of the business plan presented to Vangelisti were derived from the business plan of J & J, Inc. verbatim.

The balance sheet for GPFS, as presented to Vangelisti in the business plan, was dated July 15, 1990 and appeared as follows:

## ASSETS

Current Assets

| | | |
|---|---:|---:|
| Cash | 20,206.17 | |
| Accounts Receivable | 1,000.00 | |
| Merchandise Inventory | 25,625.00 | |
| Office Supplies | 1,312.00 | |
| Computer Supplies | 500.00 | |
| | | 48,643.07 |
| Fixed Assets | | |
| Office Equipment | 19,500.00 | |
| Computer Equipment | 13,600.00 | |
| | | 33,100.00 |
| TOTAL ASSETS | | 81,743.07 |

## LIABILITIES

Current Liabilities

| | | |
|---|---:|---:|
| Accrued Salaries | 4,500.00 | |
| Accrued Taxes | 322.00 | |
| | | 4,822.00 |
| Long Term Liabilities | | |
| Insurance | 1,200.00 | |
| | | 1,200.00 |
| TOTAL LIABILITIES | | 6,022.00 |
| **CAPITAL** | | 75,721.07 |
| TOTAL LIABILITIES & CAPITAL | | 81,743.07 |

---

(Plaintiff's Exhibit 6). Of significant import is the fact that the balance sheet for GPFS, as set forth above, is *identical* in all respects to a financial statement dated August 15, 1990 that Kerbaugh utilized in connection with the promotion of another unrelated company called Pacific Coast Bank Services. (*See* Plaintiff's Exhibit 33). Keith Kerbaugh testified that he prepared the business plan and balance sheet for Pacific Coast Bank Services at Kerbaugh's direction and that he was instructed to merely change the company names and date on the business plan and balance sheet.

When compared with the financial statement above, the tax return prepared for GPFS for the 1990 fiscal (calendar) year reveal a markedly different picture of the company's financial position:

## ASSETS

| | |
|---|---:|
| Cash | (2,445.00) |
| Buildings and Other Depreciable Assets (Net) | 4,473.00 |
| Intangible Assets (Net) | 54,972.00[7] |
| Total Assets | 57,000.00 |

## LIABILITIES & EQUITY

| | |
|---|---:|
| Accounts Payable | 11,876.00 |
| Stockholder Loans | 45,190.00 |
| Capital Stock | 1,000.00 |
| Retained Earnings | (1,066.00) |
| Total Liabilities & Equity | 57,000.00 |

7. Kerbaugh testified that the intangible assets depicted in the tax return constituted preincorporation costs.

(Plaintiff's Exhibit 31). During cross-examination, Kerbaugh readily acknowledged that the overwhelming majority of the assets depicted in the balance sheet contained in the business plan submitted to Vangelisti, in reality, never belonged to or were ever received by GPFS. By way of explanation, Kerbaugh testified that the balance sheet figures represented commitments from a specific pledge from another company called J & J, Inc. which were never realized.

### 4.

### *The Operation*

As a viable entity, the actual operations of GPFS were negligible at best. The corporation's gross income/sales for the 1990 fiscal year was $2,000.00. (Plaintiff's Exhibit 31). Despite the balance sheet depiction that the corporation had $33,100.00 in office and computer equipment, the deposition testimony of the business manager/secretary of GPFS clearly indicated that the company had no equipment or even an operational office:

Q: Were you aware of any computer equipment or office equipment that actually belonged to Great Plains Financial Services?

A: No. Actually the office and computer equipment on this balance sheet that's posted is fictionary. The only equipment that we had belonged to David Hughes. So this was more of a futuristic maybe some day we'll own this.

\* \* \* \* \* \*

Q: Were you aware that there was any other office set up in town besides the one in your home?

A: I know that he [Kerbaugh] was working at setting up an office at Metro Drug.

Q: And that really wasn't part of what you were doing?

A: Well, it was. I was with him to try to set that up. We had some potential investors coming into town, and David and I ran over there and tried to make it look like an office, you know, with the shelving and whatnot. But it was never a functioning office.

(Deposition of Lori Hapenny, at pp. 7 & 9–10).

### 5.

Shortly after the funds from the Vangelisti loan were disbursed to Kerbaugh on January 7, 1991, Kerbaugh began making payments primarily to himself and other insiders from the business account purportedly for the purpose of repaying various loans and advances that were made to or on behalf of the company. By mid-February 1991, the Vangelisti funds had been virtually exhausted. Although several payments were made to Vangelisti in order to service the debt, GPFS eventually defaulted on the loan. A default judgment was entered against GPFS and jointly and severally against the debtors personally in Superior Court of California, Santa Clara County on September 14, 1992 in the amount of $67,339.25.

### CONCLUSIONS OF LAW

### 1.

Section 523 of the United States Bankruptcy Code enumerates specific exceptions to the general rule of the dischargeability of debts in bankruptcy. In determining whether a particular debt falls within the ambit of § 523, the statute should generally be construed liberally in favor of the debtor and strictly against the objecting creditor in order to effectuate the fresh start principles which pervade the entire bankruptcy system. *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir.1987); 3 *Collier on Bankruptcy*, ¶ 523.05A at 523–19 (15th ed.1993). This liberal construct is, however, tempered by

the view that such equitable considerations ' "are applicable only to honest debtors." ' *Van Horne*, 823 F.2d at 1287 (quoting *In re Hunter*, 771 F.2d 1126, 1130 (8th Cir. 1985)). As stated by the Eighth Circuit Court of Appeals: "While we note that the underlying policy of the Bankruptcy Code is to give honest debtors a fresh start, we do not believe we need strictly construe the provisions of the Code in favor of dishonest debtors." *Thul v. Ophaug (In re Ophaug)*, 827 F.2d 340, 343 (8th Cir.1987). Such a view is based on a prevailing notion that different considerations are applicable once a creditor has met the burden of demonstrating that a debt falls within the fraud exception to discharge under § 523(a)(2) of the Code and, therefore, has established the debtor's dishonesty as to a specific debt. *Jennen v. Hunter (In re Hunter)*, 771 F.2d 1126, 1130 (8th Cir.1985). As opined by the Eighth Circuit: "Congress established a fraud exception to discharge 'to discourage fraudulent conduct and to ensure that relief intended for honest debtors does not inure to the benefit of the dishonest.' " *Id.* (quoting *In re Wilson*, 12 B.R. 363, 370 (M.D.Tenn.1981)).

 The operative provision relied upon by the plaintiff, Rick Vangelisti, to establish a basis for nondischargeability of the debt owed by the defendants is § 523(a)(2)(B), which renders nondischargeable in a Chapter 7 case any debt:

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

\* \* \* \* \* \*

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; ...

11 U.S.C. § 523(a)(2)(B). Thus, under the foregoing section, a creditor may have a debt owed to it declared nondischargeable provided that the following six elements are established:

(1) the debtor makes, (2) a statement in writing, (3) respecting the debtor's or an insiders [sic] financial condition, (4) which statement is materially false, (5) which is made with the intent to deceive, and (6) which is reasonably relied upon by the creditor.

*Avco Fin. Servs., Inc. v. Frey (In re Frey)*, 150 B.R. 742, 745 (Bankr.D.N.D.1992). Each of the § 523(a)(2) elements must be proved, with the party objecting to dischargeability bearing the burden of proof with respect to each element. *Management Jets Int'l, Inc. v. Mutschler (In re Mutschler)*, 45 B.R. 482, 490 (Bankr.D.N.D. 1984). *See* F.R. Bankr.P. 4005. The proper standard of proof applicable in nondischargeability actions which arise under § 523(a) was conclusively established by the United States Supreme Court as the ordinary preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 283–91, 111 S.Ct. 654, 657–61, 112 L.Ed.2d 755 (1991).

With the foregoing standard in mind, the court will measure the facts of this case as previously outlined against the legal elements that the plaintiff must establish in order to support a finding of nondischargeability under § 523(a)(2)(B) of the Bankruptcy Code.

### 2.

### *In Writing Respecting the Debtor's Financial Condition*

The initial hurdle in a § 523(a)(2)(B) exception determination is essentially a two-prong test, the first element being the demonstration of a document, while the second element focusing on the content of the document.

■ In order for a statement made by the debtor to render a debt nondischargeable under § 523(a)(2)(B), the statement, to be in writing, must have been either signed by the debtor, written or produced by the debtor, or have been adopted and used by the debtor. *Mutschler,* 45 B.R. at 490; *Household Fin. Corp. v. Howard (In re Howard),* 73 B.R. 694, 702 (Bankr.N.D.Ind. 1987); 3 *Collier on Bankruptcy,* ¶ 523.09 at 523-61 (15th ed.1993). A written statement does not have to be physically prepared by a debtor in order to satisfy the in writing requirement of § 523(a)(2)(B). *Chevy Chase Fed. Sav. Bank v. Graham (In re Graham),* 122 B.R. 447, 451 (Bankr. M.D.Fla.1990). The in writing requirement is satisfied if existence of the written statement was either signed, adopted and used, or caused to be prepared by the debtor. *Id.*

■ An objecting creditor that relies on a debtor's oral misrepresentations of his or her financial wherewithal will not be entitled to a nondischargeability determination under § 523(a)(2)(B). Honorable Nancy C. Dreher & Matthew E. Roy, *Bankruptcy Fraud and Nondischargeability Under Section 523 of the Bankruptcy Code,* 69 N.D.L.Rev. 57, 76 (1993). Similarly, subsection (B) cannot be satisfied by just any writing. It must be a statement "respecting the debtor's financial condition". 11 U.S.C. § 523(a)(2)(B).

■ The evidence in the instant case unequivocally indicated that the business plan, and matters contained therein, that was submitted to Vangelisti by Kerbaugh were either prepared by Kerbaugh personally or at his specific direction. The business plan contained extensive written documentation which was intended to be representative of the complete financial condition of GPFS. The business plan contained: pro forma income statements which provide a quarterly operational analysis for 1991 and yearly analysis for the next three

years, a number of statements outlining the sources and applications of funding, a capital equipment list, and a detailed balance sheet which clearly set forth GPFS's assets, liabilities and capital. Accordingly, the business plan clearly qualifies as a statement made in writing respecting the debtor's financial condition.

### 3.

■ Once it is shown that the statement was in writing respecting the debtor's financial condition, the next element mandated by § 523(a)(2)(B) is the requirement that the statement at the time it was made was not only false, but "materially false." A statement utilized by a debtor in order to obtain a loan is "materially false" within the meaning of the statutory exception to discharge if it not only contains erroneous information, but rather contains information that is substantially inaccurate. *Miller v. Boles (In re Boles),* 150 B.R. 733, 740 (Bankr.W.D.Mo.1993); *see Management Jets Int'l, Inc. v. Mutschler (In re Mutschler),* 45 B.R. 482, 490, 491 (Bankr. D.N.D.1984) (stating that "[i]t is not sufficient to show that the statement is [merely] factually incorrect . . .", the falsity must be an "important or substantial untruth.").

■ The concept of "materiality" within the context of § 523(a)(2)(B) includes both objective and subjective components. Dreher & Roy, *supra,* at 76. Objectively, a statement is materially false for purposes of § 523(a)(2)(B) if it is one that "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which normally affect the decision to grant credit." *Avco Fin. Servs. v. Frey (In re Frey),* 150 B.R. 742, 745 (Bankr.D.N.D.1992). The relevant subjective inquiry, although not dispositive, is whether the complaining creditor would have extended credit had it been apprised of the debtor's true situation. This court has previously noted that:

'The question of materiality should be judged not on the basis of the size or seriousness or [sic] the error, but by a comparison of the debtor's actual financial condition with the picture he paints of it. A financial statement which markedly overstates the value of a person's assets, so as to distort his financial picture must be materially false.'

*Mutschler,* 45 B.R. at 491 (quoting *In re Denenberg,* 37 B.R. 267 (Bankr.D.Mass. 1983)) (citations omitted). Material falsity mandates a showing that the financial picture as a whole is a false representation of the debtor's over-all financial condition. *Id.* Further, it is well established that the concealment, understatement or omission of any of a debtor's material liabilities can readily constitute a statement which is materially false equally as well as a false assertion. *See Frey,* 150 B.R. at 745; *Mutschler,* 45 B.R. at 490–91.

 In this case, the financial statement and projections depicted in the business plan were devoid of even a scintilla of accuracy or truthfulness. There is absolutely no doubt that the business plan and financial statement of July 15, 1990, were egregiously false both as to inflated asset values and omitted liabilities. The business plan and financial statement represented that GPFS had substantial equity investments, assets, and minimal liabilities when the true state of affairs revealed a markedly different financial profile. Kerbaugh by his own admission acknowledged that not a single item which was represented to be an asset of GPFS in the balance sheet, a great number of which were pledged as collateral for the Vangelisti loan, was ever actually owned by or in the possession of GPFS.[8] The evidence further established that the GPFS had incurred a significant amount of liabilities which were omitted from the business plan and the financial statement that was submitted by Kerbaugh to Vangelisti.

The significance of the gross misrepresentations of assets and liabilities in the instant case must be interpreted in light of the function the business plan served. The purpose of the business plan and accompanying financial data is to enable an investor or lender to make a realistic assessment of the risk involved in financing the venture. Vangelisti testified that he would not have invested in GPFS had he known the company's true financial picture and this court is of the firm belief that neither would any other reasonable investor or lender. Accordingly, the court finds the gross misrepresentation of assets and liabilities rendered the financial statement contained in the business plan materially and substantially inaccurate.

### 4.

### *Intent to Deceive*

 Under § 523(a)(2)(B), a creditor must demonstrate by a fair preponderance of the evidence that the statement was made with an intention of deceiving the creditor. Although actual knowledge of the falsity of financial information provided by the debtor to a creditor will satisfy the intent requirement, a demonstration that the debtor acted with recklessness as to the truth or accuracy of the submitted information will suffice. *Frey,* 150 B.R. at 745. It has thus been held that where a debtor either knowingly or recklessly makes a false representation which the debtor knows or at least should have known at the time the statement was made will induce a lender to extend credit, scienter or an intent to deceive sufficient to satisfy § 523(a)(2)(B) may be logically inferred. *Household Fin. Corp. v. Howard (In re Howard),* 73 B.R. 694, 703 (Bankr.N.D.Ind. 1987).

 Although proof of fraudulent intent must generally be gleaned from surrounding circumstances since it is rarely susceptible to direct proof, "a clear pattern of purposeful conduct will support a finding of fraudulent intent." *Mutschler,* 45 B.R. at 491. As previously intimated, "the

---

**8.** In contrast to the balance sheet which represented that GPFS had $81,743.07 in total tangi-

ble assets, GPFS actual total tangible assets were negligible.

mere fact that the statement is false and the debtor knew it was false has been held determinative of an intent to deceive." *Butler v. Roberts (In re Roberts)*, 54 B.R. 765, 771 (Bankr.D.N.D.1985). Moreover, a debtor's mere "unsupported assertions of honest intent will not overcome the natural inferences from admitted facts." 3 *Collier on Bankruptcy,* ¶ 523.10 at 523–72 (15th ed.1993).

■ Courts have been more apt to impose responsibility in connection with the utilization of a false writing where the debtor is an individual of intelligence and experienced in financial matters. *Mutschler,* 45 B.R. at 491 (citing various authorities). Kerbaugh is a highly educated individual who is not unsophisticated in financial or commercial affairs. The overwhelming evidence in this case makes it virtually impossible to conclude that an individual with Kerbaugh's financial experience did not intend to disseminate false information. Kerbaugh's fraudulent intent is perhaps best exemplified by the deposition testimony of GPFS's business manager/secretary Lori Hapenny:

Q: Does [the business plan] look familiar to you?

A: That's the Business Plan that I did for David [ (Kerbaugh) ].

Q: You prepared this on your typewriter?

A: On the computer, yep.

Q: Did he give you the information for this Business Plan?

A: Yes, he did.

Q: Did he make any changes in this Business Plan at all?

A: On a daily basis.

Q: What kind of changes did he make?

A: There were a few rhetorical corrections and whatnot; but for the most part it was the financial statements, personal, business, assets, liabilities, the performers [ (stockholders) ].

Q: Why—do you know why he changed the numbers?

A: Well, a lot of it was to suit whatever purpose the Business Plan was going out for. David's philosophy was if you look successful on paper, people treated you successfully.

Q: He stated that to you?

A: Yes, he did, several times.

＊　＊　＊　＊　＊　＊

Q: You'd indicated that I believe as far as the one you were working on, the Business Plan, you got your figures from David Kerbaugh?

A: Right....

Q: When did you first start working on the Business Plan?

A: That was one of the first things I did for David. And it continued to be just about the only thing that consumed my hours with David, was this. I mean, it was literally altered that often. I mean, I would sit at my house from 6 o'clock at night till 6 o'clock in the morning and make changes; and David would come at 7 o'clock in the morning and run this over to get it—you know, for the Economic Development Program and whatnot. I was doing this constantly.

(Deposition of Lori Hapenny, at pp. 4–5, 14). Moreover, Kerbaugh's own testimony clearly revealed that he knew that the financial statement that he presented to Vangelisti was completely false at the time that he submitted it. In an attempt to attenuate the taint of his fraud, Kerbaugh proffered the explanation that the balance sheet figures, which portrayed the financial condition of GPFS on July 15, 1990, consisted of an asset pledge from another company. Insofar as it was calculated to somehow dissipate the blatant falsity of the financial statement, the court finds his testimony on this point not credible and, indeed, incredible. The court easily concludes that the element of intent to deceive has been met with the requisite degree of proof.

5.

*Reasonable Reliance*

■ For a debt to be excepted from discharge under § 523(a)(2)(B), the creditor

purporting to rely on a materially false written statement must satisfy a two-part inquiry by demonstrating that its reliance was both actual and reasonable.

Actual reliance mandates that the creditor did in fact subjectively rely upon or utilize the submitted information when making the decision to extend credit. To establish actual reliance, a showing of a degree of proximate cause must be made. This court has found that:

> Proximate cause is not, in the tort sense, an independent element of proof but is merely a way of clarifying the causation factor inherent from a complete reading of § 523(a)(2)(B). The preface to this section provides that a discharge does not discharge a debtor from a debt for obtaining an extension of credit *by* use of a false statement. Thus, the statute itself presupposes in the first instance that it was the statement which was the causative factor in the extension of credit, without which the other elements of this section are not even reached.

*Management Jets Int'l, Inc. v. Mutschler (In re Mutschler)*, 45 B.R. 482, 492 (Bankr. D.N.D.1984). As such, a creditor must show that its reliance on the false statement was ' "a contributory cause of the extension of credit" ' and ' "that credit would not have been granted if the lender had received accurate information." ' *Marx v. Reeds (In re Reeds)*, 145 B.R. 703, 707 (Bankr.N.D.Okla.1992) (quoting *In re Anzman*, 73 B.R. 156, 164 (Bankr.D.Colo. 1986)). *See Mutschler*, 45 B.R. at 492. It is well established, however, that although actual reliance must be demonstrated, the creditor does not have to show that the writing was the *only* influential factor in the decision to extend credit. *Mutschler*, 45 B.R. at 492. It is sufficient for § 523(a)(2) if the creditor establishes that it *partially* relied on the false statement or that the false statement was the principal precipitant for the extension of credit, in

the absence of which credit would not have been made. *Id.*

The reasonableness of a creditor's reliance on a false statement is an objective determination, i.e. that degree of care which a reasonably prudent creditor or lender in an average business transaction under similar circumstances would exercise. *Marx v. Reed (In re Reeds)*, 145 B.R. 703, 707 (Bankr.N.D.Okla.1992); *Mutschler*, 45 B.R. at 492–93. A related issue in examining the reasonableness of a creditor's reliance is whether the creditor is under a *per se* duty of verification or had an absolute duty to make independent inquiries into the financial condition of a debtor in order to confirm the authenticity of the writing. Although a creditor's reliance on a false statement has been found unreasonable where the false writing was obviously false on its face, when the creditor knew that the writing was incomplete or inaccurate, or when the creditor's own investigation suggested that the writing was false or incomplete, there is no duty forced upon a creditor to make independent inquiries of a debtor's financial condition unless the statement is facially inaccurate or the creditor's normal business practice dictates such an inquiry in each instance. *Mutschler*, 45 B.R. at 493 (citing various authorities). The reasonable reliance requirement should not be a vehicle by which courts that have the benefit of 20–20 hindsight second guess the wisdom of a creditor's lending decision. *See generally Reeds*, 145 B.R. at 707. Moreover, creditors that receive financial information in connection with a loan

> are entitled to rely on a written statement as being an accurate representation of what it purports to be as long as fraud is not apparent from the document itself. To rule otherwise would render the use of financial statements meaningless and would run contrary to long established business practice regarding their preparation and use.

*Mutschler*, 45 B.R. at 493. The imposition of an absolute duty to verify "requires the creditor to be wary of any applicant and to assume that the material within the statement is not accurate. Such a defensive posture will most certainly restrict the flow

of credit." Matthew D. Amhut, *Section 523(A)(2)(B); Exceptions to Discharge for Fraudulently Obtained Loans,* 5 Bankr. Dev.J. 151 (1987).

 In this case, the evidence clearly established that business plan the financial statement submitted by Kerbaugh in conjunction with the business plan played a substantial role in Vangelisti's decision to make the loan. Although Vangelisti relied on Kerbaugh's oral representations as well as other representations in the business plan, the financial statement was the precipitating cause in the extension of financing. There was nothing from the face of the business plan or the financial statement that raised any red flags which put, or reasonably should have put, the plaintiff on notice that the financial statement was entirely fraudulent or that further investigation was warranted. Nevertheless, Vangelisti as a prudent investor/lender conducted a commercially reasonable investigation of the information that had been supplied by Kerbaugh in the business plan. Indeed, Vangelisti employed an attorney experienced in financial matters to verify and assess the information presented in the business plan who, after extensive review, was unable to detect any inaccuracies or inconsistencies.

The court is satisfied that Vangelisti actually and reasonably relied upon the financial statement contained in the business plan to its detriment and that such reliance resulted in the complained of loss.

### 6.

For the aforementioned reasons, the court concludes that Rick Vangelisti has proven by a fair preponderance of the evidence all the requisite elements necessary to support the denial of discharge under § 523(a)(2)(B).

### CONCLUSION

All elements of Rick Vangelisti's complaint for nondischargeability under § 523(a)(2)(B) of the Bankruptcy Code have been satisfied. Accordingly, IT IS ORDERED that judgment be entered in favor of Rick Vangelisti, and against the debtor David B. Kerbaugh declaring that the state court judgment debt in favor of Rick Vangelisti, and against the debtor, David B. Kerbaugh in the sum of $67,339.25 is nondischargeable in bankruptcy.

In accordance with the provisions of the original loan agreement, IT IS FURTHER ORDERED that judgment for costs and reasonable attorney's fees shall be assessed against the defendant, David B. Kerbaugh.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**