In re David Michael **TOWNSLEY, fdba FTI, d/b/a Foam Technologies, Inc., fdba Foam Technologies, fdba Foam Technologies, Inc., Debtor.**

Michael **MOZEIKA, Jr., Individually and Derivatively on Behalf of Foam Technologies, Inc., and New Dimension Industries, Inc., Plaintiff,**

v.

David Michael **TOWNSLEY, Defendant.**

Bankruptcy No. 93–40287.
Adv. No. 93–4149.

United States Bankruptcy Court,
E.D. Texas,
Sherman Division.

April 10, 1996.

---

**22.** In this regard, see also our discussion in footnote 4 of this opinion.

Michelle Bohreer, Seiler, Cohn & Stebbins, L.L.P., Houston, Texas, for Plaintiff.

David Townsley, McKinney, Texas, Defendant Pro Se.

### OPINION

DONALD R. SHARP, Bankruptcy Judge.

COMES NOW before the Court for consideration the Original Complaint to Determine Dischargeability of Debt and to Object to Discharge. This opinion constitutes the Court's findings of fact and conclusions of law to the extent required by Fed.R.Bankr.P. 7052, and disposes of all issues before the Court.

### FINDINGS OF FACT

David Townsley ("Townsley") has developed a certain expertise in manufacture and marketing of foam wraps for the automotive industry and other motorized applications. The testimony did not explain exactly how a foam wrap functions, but the technical aspects of the manufacture and application of the device is not necessary to a resolution of the issues in this case. It is sufficient to know that foam wraps are a component of filter systems on engines and can be sold to manufacturers for use as original equipment or can be placed in various retail locations for sale to consumers for use in engines owned by the consumer.

In mid-summer of 1990, probably July, mutual acquaintances introduced Townsley to Michael Mozeika ("Mozeika") who owned and operated a business called New Dimension Industries, Inc. which was located in New Jersey. Mozeika was in certain aspects of the same business as Townsley and it was

believed by the mutual acquaintance that the expertise of the two parties would complement each other in the further manufacture and marketing of foam wraps and related filter products for the automotive industry.

The parties engaged in some discussion in which there was a loose agreement that Mozeika, through his corporation, would supply capital in the form of cash and raw materials to Townsley who would incorporate those raw materials into a finished product for sale. It is clear from the testimony that the parties did not have a really clear understanding of their exact business relationships and apparently each of them deliberately left the relationship rather vague in what this Court believes to be an effort on the part of each to gain some ultimate advantage.

In October of 1990, Townsley produced a pro forma income statement projecting very rosy results and lucrative profits which could be expected from their joint development and marketing efforts. The pro forma contained a complete business plan which envisioned the commencement of manufacture of foam wraps which would gradually expand to include a complete line of marine filters, custom filters, direct replacement filters and heavy duty filters. As it turns out, the projections were far too optimistic and the level of predicted sales never materialized. For his part, Mozeika agreed to furnish up to $80,000.00 in cash and raw materials to fund the business and get it up and going.

The parties never agreed on the exact form of entity to use in their new joint venture but after their meetings in the fall of 1990 and clearly without the agreement and concurrence of Townsley, Mozeika caused a corporation to be formed and registered in New Jersey known as Foam Technologies, Inc. He listed himself and Townsley as the officers of this corporation and listed Townsley as a fifty (50%) percent owner of the corporation. There was never any corporate stock issued and the state of the corporate records is unknown to the Court. Although Townsley did not participate in the forming of the corporation, he apparently ratified the actions of Mozeika by continuing with the joint enterprise.

Although both parties were ostensibly fifty (50%) percent owners of a new business that was a joint enterprise, they continued to work completely independently and never formed a coherent operating company in which each was fully acquainted with what the other was doing and what was happening in their joint enterprise.

Townsley continued to operate in North Texas in an effort to market their products and continued to supply Mozeika with overly optimistic projections of future sales. Mozeika continued to operate his business in New Jersey and supplied part of the capital he had agreed to supply along with some amounts of raw materials to be used in the manufacture of the foam wraps. However, it is clear that relationships began to deteriorate almost from the beginning. Mozeika expected profits to start flowing in quickly, and Townsley expected the cash infusion from Mozeika to flow much more quickly than it did. Consequently, the relationship between the two became strained from the beginning and there was constant tension between the parties dealing with what Townsley felt was Mozeika's failure to properly fund the operation and what Mozeika thought was Townsley's failure to produce the lucrative profits he expected. Although the parties continued to maintain their relationship, it is clear from the correspondence introduced into evidence that communication between the two was becoming more and more strained. In December, 1990 the relationship had deteriorated to the point that Mozeika required Townsley to execute personal guaranties for the funds advanced. By February or March of 1991, there was a defacto termination of their mutual efforts. At that point, Mozeika had not supplied the $80,000.00 in capital but had only supplied slightly more than half that amount and Townsley had not produced anything like the sales projected in his earlier pro forma statements. Although the parties did not formally terminate their relationship and liquidate the corporation, they did terminate any pretense of working together and Mozeika began to demand repayment of the sums he had advanced to Townsley. From late February or early March of 1991, there was no longer any pretense that these parties were

working together and from that point forward it is clear that Townsley was attempting to find other suppliers of raw materials and attempting to continue to market his product. Apparently he met with some limited success in that he did sell at least $315,000.00 worth of product to Purolator.

It is clear that in March of 1991 Townsley began to transact business individually and use the trade name Foam Technologies Industries. In March of 1991 Townsley opened a separate bank account and from that point forward proceeded to do business as a sole proprietorship and utilized the name "Foam Technologies" or the initials "FTI" in his business transactions. Townsley testified that it was his belief that his relationship with Mozeika was severed at that point. It is clear to this Court that both parties were fully aware that their joint venture was at an end. Although the parties were no more definitive and formal in the termination of their relationship than they were in the formation of their relationship, it is clear that their efforts to work together developed in the fall of 1990 and terminated in the spring of 1991. It is also clear that they never had a mutual understanding of the goals that each had for their joint enterprise, and it is clear that each party attempted to use the vague nature of their relationship to advance what he perceived as his personal best interests.

On or about March 12, 1993, Townsley filed for relief under Chapter 7 of the Bankruptcy Code. His only explanation as to the disposition of the $315,148.88 he received from sales is that it was used to pay expenses. His Statement of Financial Affairs failed to list any income received in the year 1991. Mozeika has brought the present complaint seeking $45,700.00 in damages individually and judgment that such damages are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and § 523(a)(2)(B); $22,545.30 in damages for New Dimensions and judgment that such damages are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(a); $315,148.88 in damages for FTI and judg-

ment that such damages are nondischargeable under 11 U.S.C. § 523(a)(4); judgment denying Townsley's discharge pursuant to 11 U.S.C. § 727(a)(4)(A) and § 727(a)(5); and attorney's fees in the amount of $87,000.00.

### DISCUSSION

#### I. MOZEIKA

Mozeika invested in FTI because of representations by Townsley that such investment would be very profitable. Townsley told Mozeika that he had a substantial existing client base, which would inure to the benefit of FTI. He produced pro formas that projected substantial sales and income from these and other clients. (Exhibits 201–203). Moreover, Townsley represented that he was developing a potentially large client, Purolator, for FTI.

Mozeika advanced $45,700.00 to FTI from December, 1990, through February, 1991.[1] However, beginning in December, 1990, Mozeika insisted on personal guarantees from Townsley for one-half (½) of all monies forwarded by Mozeika. (Exhibits 302–307). This money was supposed to be Mozeika's investment in the business to be used to develop product and potential clients for FTI. As the relationship between the parties deteriorated it is apparent that Mozeika began to view it more as a loan and insisted on the personal guarantees.

For his part, Townsley had wholly failed to produce the volume of sales predicted in his optimistic pro forma that had been presented to Mozeika. Actual sales were almost nonexistent and Townsley was long on promises but very short on performance. Townsley's version of the cause for this failure was his constant problem in getting Mozeika to live up to the investment promises he had earlier made. Mozeika argues that Townsley was secretly attempting to form alliances with other suppliers and customers and deliberately take the business for himself. The Court is convinced that there is probably a grain of truth in both of their positions but does not believe that Townsley set out to induce Mozeika to invest in a business and

---

1. Actually, New Dimensions, Inc., forwarded the money to FTI. Mozeika is 100% shareholder of New Dimensions, Inc. and the exact arrange-

ment between him and his wholly owned corporation are not relevant to the issues before the Court.

then take the business away from Mozeika. It is clear to this Court that Mozeika was attempting to use Townsley's expertise in marketing and manufacturing the product while only investing a minimal amount of funds. It is further clear that the relationship of the parties changed over the early months of their joint venture when it became clear that neither of them really understood the motives of the other in joining forces. There is absolutely no evidence that Townsley ever attempted to steal the business from Mozeika. There is ample evidence that after the relationship between the parties became irreparable in late February or early March of 1991, that Townsley then attempted to salvage his marketing program for his own account. There is also ample evidence that Mozeika was at least equally to blame for the breakdown in their relationship. The correspondence between the parties makes it clear that in February of 1991 Mozeika was no longer interested in advancing the joint effort of the parties. At that point, his emphasis had shifted to recovering the monies that he had advanced. It is unclear whether Townsley still felt that the joint enterprise could be saved but his correspondence to Mozeika indicates that he was at least giving lip service to continuing the relationship by urging Mozeika to continue to support the manufacturer of the product with an infusion of funds. This infusion of funds was not forthcoming and consequently, there was no hope of their continuing with their joint enterprise, and there is no question but that both parties recognized the breakdown of their relationship at that point. The present action is a continuation of Mozeika's efforts to collect the monies he had advanced and to that end he now seeks to have the $45,700.00 that he advanced declared a nondischargeable debt under § 523(a)(2)(A) and § 523(a)(2)(B).

A. *§ 523(a)(2)(A)*

██ Under § 523(a)(2)(A), a debt will not be discharged to the extent that the money at issue was obtained by "false pretenses, false representation or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). The burden is on the creditor to prove by a preponderance of the evidence that each of the elements under § 523(a) has been met. *Grogan v. Garner*, 498 U.S. 279, 285-87, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). Historically, the five elements a creditor must establish to prevail under this section of the Code include:

(1) the debtor made representations;

(2) the debtor knew the representations were false at the time they were made;

(3) the representations were made with the intent to deceive the creditor;

(4) the creditor relied on the representations;

(5) the creditor was injured by the representations and suffered damages as a result.

*In re Friend*, 156 B.R. 257, 260 (Bkrtcy. W.D.Mo.1993); *In re Schwartz & Meyers*, 130 B.R. 416, 422 (Bkrtcy.S.D.N.Y.1991).

It is clear that Townsley represented to Mozeika that he would be investing in a profitable business, FTI. Townsley told Mozeika that he had a substantial client base which would provide substantial income to FTI. He also represented that he was developing new clients for FTI, most significantly Purolator. Townsley agreed that the money provided by Mozeika would be used to develop product and clients for FTI.

██ The Court must determine whether these representations fall within the scope of § 523(a)(2)(A). Generally, the misrepresentations must be of past or current acts; a promise to perform acts in the future is not considered a qualifying misrepresentation merely because the promise subsequently is breached. *Matter of Allison*, 960 F.2d 481, 484 (5th Cir.1992). Likewise, a mere expression of opinion, expectation or declaration of intention is not actionable under § 523(a)(2)(A). *Schwartz & Meyers*, 130 B.R. at 423. Representations of future profitability or client development, in the absence of proof that they were knowingly false, would not fall within the scope of § 523(a)(2)(A).

[6] A debtor's misrepresentation of his intentions or opinions may constitute a false representation within the meaning of the dis-

chargeability provision if, when the representation is made, the debtor has no intention of performing as promised or does not hold the expressed opinion. *Allison,* 960 F.2d at 484; *Schwartz & Meyers,* 130 B.R. at 423.

 ■ There is no evidence before the Court that Townsley knew the representations he was making to be false at the time he made them or that he had no intention to carry out the promises made at the time they were made. The mere fact that his optimistic projections did not come true are certainly not badges of fraud. Mozeika is an experienced businessman and he knows that a pro forma income statement showing a future business to be a highly profitable enterprise is nothing more than a sales technique that may or may not be valid. Simply proving that the projections were overly optimistic is not sufficient. There must be some proof that the person making the representations knew of their falsity and made those representations anyway. That proof was simply not forthcoming in this case.

 ■ Mozeika also argues that Townsley was engaged in negotiations with Purolator and Ramair Filters on his own account at the time that he should have been devoting one hundred (100%) percent of his energies to the corporation. This claim also falls far short of proof. It is clear that Townsley negotiated with Purolator and was attempting to enter into a significant deal with Purolator. He repeatedly sent information to Mozeika concerning his negotiations with Purolator and repeatedly told Mozeika that he needed additional funds in order to manufacture the product and close the deal with Purolator. There is no evidence whatsoever that he intended his deal with Purolator to be for his benefit to the exclusion of Foam Technologies, Inc. during the time that the joint enterprise was ongoing. What is clear is that after the relationship between Mozeika and Townsley became irreparably breached, Townsley then proceeded to transact with Purolator on his own account and to the extent any profit may have been made on that transaction, he retained those profits. That set of circumstances might very well give rise to a quantum meruit claim by Mozeika that he is entitled to some of the bene-

fits of that transaction. However, that question is not before the Court. The question to be resolved is whether that set of circumstances is a fraudulent act on Townsley's part that bars the discharge of whatever debt he may owe to Mozeika in connection with the transaction. This Court must find that Mozeika has failed to prove the requisite intent on the part of Townsley to defraud Mozeika by dealing with Purolator on his own account. There simply is no proof that Townsley intended his transactions with Purolator prior to March of 1991 to inure to his benefit rather than that of Foam Technologies, Inc. In fact, the evidence is to the contrary in that Townsley was keeping Mozeika fully aware of the fact that he was in contact with Purolator and was attempting to make a deal with Purolator. Mozeika's evidence falls short of the proof needed to establish nondischargeability under § 523(a)(2)(A).

**B.** *§ 523(a)(2)(B)*

 ■ Under § 523(a)(2)(B), a creditor may have a debt owed to it declared nondischargeable if: (1) the debtor makes (2) a statement in writing (3) respecting the debtor's or an insider's financial condition; (4) which statement is materially false, (5) is made with the intent to deceive, and (6) is reasonably relied on by the creditor. 11 U.S.C. § 523(a)(2)(B); *In re Kerbaugh,* 159 B.R. 862, 870 (Bkrtcy.D.N.D.1993); *In re Bailey,* 145 B.R. 919, 929 (Bkrtcy.N.D.Ill. 1992). The burden is on the creditor to establish these six elements by a preponderance of the evidence. *Grogan,* 498 U.S. at 285–87, 111 S.Ct. at 659.

 ■ Mozeika asserts that the pro formas produced by Townsley (Exhibits 201–203) constitute statements in writing respecting an insider's, FTI, financial condition.

However, in reviewing cases analyzing § 523(a)(2)(B), the Court finds that most cases involve statements of a debtor or insider's *present* financial condition. Moreover, in all cases liability was imposed under § 523(a)(2)(B) for misrepresenting the values of assets or liabilities. See *Kerbaugh,* 159 B.R. 862; *Bailey,* 145 B.R. 919. The Court

was unable to find any cases where liability was imposed under § 523(a)(2)(B) for overestimating future sales or income.

The Court must reject Mozeika's assertion that the pro formas represented current sales. Each was titled "pro forma" and clearly displayed projections or estimates of *future* sales.

This Court will not impose liability under § 523(a)(2)(B) for merely overestimating future sales.

## II. *New Dimensions*

New Dimensions provided FTI with $22,545.30 worth of foam based on Townsley's representations that the foam would be used to develop product for FTI. Townsley also guaranteed payment for the foam.

As discussed earlier, the evidence fails to show any fraudulent intent on Townsley's part at the time the transaction began. New Dimensions, Inc. is on exactly the same footing as Mozeika, its one hundred (100%) percent shareholder. Since no fraudulent intent on Townsley's part has been demonstrated, this is simply a legitimate debt that is dischargeable in the normal course of bankruptcy proceedings.

## III. *FTI*

Mozeika, on behalf of FTI, seeks judgment against Townsley in the amount of $315,148.88. Mozeika further seeks to have the judgment declared a nondischargeable debt under § 523(a)(4).

The Court must first determine whether Mozeika can properly bring this derivative action on behalf of FTI. Since FTI is a New Jersey corporation, the Court must look to New Jersey law. However, Texas and New Jersey law are very similar with respect to stockholder's derivative actions. Compare Tex.Bus.Corp.Act. art. 5.14 (Vernon 1980) with N.J.Stat.Ann. § 14A:3–6 (West 1995). Both statutes require that plaintiff be a shareholder at the time of the transaction of which he complains, and that plaintiff state the efforts to have suit brought for the corporation by the board of directors or state the reasons for not making such efforts.

This Court holds that Mozeika may properly bring a derivative action on behalf of FTI. Mozeika was a 50% shareholder at the time of the transaction. Although, Mozeika did not make demand on the board of directors to bring the action, this is not a fatal flaw. Mozeika and Townsley were the only directors, each owning 50% of the shares. It would have been a useless effort to demand that FTI bring the action; Townsley certainly would not agree to sue himself.

In order to prevail in a dischargeability action under § 523(a)(4), a plaintiff must prove: (1) that the debt arose while the debtor was acting in a fiduciary capacity and (2) that the debt was incurred by fraud, defalcation, embezzlement, or misappropriation. *In re Wolfington*, 48 B.R. 920, 923 (Bkrtcy.E.D.Pa.1985).

It is well established that a corporate officer is a "fiduciary" of the corporation within the meaning of § 523(a)(4). *Id.* at 924; *In re Cowley*, 35 B.R. 526, 528 (Bkrtcy.D.Kansas 1983). It is also clear that "defalcation" is a broader term than embezzlement or fraud. It can be a mere deficit resulting from the debtor's misconduct, even though he derived no personal gain therefrom. *Id.* at 529; *Matter of Moreno*, 892 F.2d 417, 421 (5th Cir.1990).

Texas corporation law applies the "corporate opportunity" doctrine where a corporation has a legitimate interest or expectancy in, and the financial resources to take advantage of, a particular business opportunity. When a corporate officer or director diverts a corporate opportunity to himself, he breaches his fiduciary duty of loyalty to the corporation. A nonconsenting shareholder may challenge the breach of fiduciary duty. In such cases, a court in equity may find that the officer or director holds the usurped opportunity as a constructive trustee for the corporation. *Matter of Safety Intern., Inc.*, 775 F.2d 660, 662 (1985).

This Court believes that a corporate officer's breach of fiduciary duty by diverting a corporate opportunity for his personal ben-

efit falls well within the meaning of the term "defalcation" under § 523(a)(4).

 The real problem with Mozeika's case is whether or not there was a business opportunity in which there was a legitimate expectancy coupled with financial resources in which the corporation could engage. Mozeika now tries to posture himself as an innocent shareholder who was duped by corporate management in the form of Townsley and claims that Townsley took the resources which the corporation made available to him for his own benefit. Actually, the relationship between these parties was a two man joint venture that was placed in the form of a corporation by Mozeika without the consent of Townsley at the time of incorporation. Mozeika was a fifty (50%) percent owner, was fifty (50%) percent of the board of directors and was fifty (50%) percent of the officers. He had just as much of a fiduciary duty to see that the corporation was well run as did Townsley. There could have been no misapprehension on the part of Mozeika that upon the breakdown of the personal relationship between these two individuals that the joint venture between them was over. He cannot now adopt the position that the breakdown in that relationship somehow converted him to a passive investor who could then do nothing and expect to be protected by Townsley as a corporate officer with fiduciary responsibilities. The situation is simply not such. Mozeika is an experienced businessman who knew or should have known of the dealings in which the corporation was engaged. The books and records of the corporation were all maintained in New Jersey and Mozeika knew of the pending deal with Purolator. He could not simply ignore the entire matter and then at a later date claim that he was in some way hoodwinked by one who had a greater duty to the corporation than he. In February of 1991 Townsley was attempting to get Mozeika to advance additional monies to the corporation so that it would have resources to take advantage of the Purolator opportunity. Mozeika refused to do so and instead, began to demand that Townsley find a way to reimburse him (Mozeika) for monies he had advanced and take over the corporation in its entirety. Mozeika referred to that as a "buy out" of the corporation. A corporation can only act through its owners and can only have knowledge through its owners and it is clear that from that point forward there was no legitimate interest in or expectancy of the corporation engaging in any business activity that would inure to the benefit of Mozeika. Obviously, it would have been a much cleaner and neater deal if the parties had formally dissolved the corporation and made arrangements to terminate any further business relations between them. The fact that they did not is not unusual and the fact that this corporation was simply allowed to languish with no formal resolution is not unusual and the fact that that was done is no more attributable to Townsley than to Mozeika. There simply was no ongoing viable corporate entity beyond March of 1991 that had any legitimate expectancy of activity by either corporate officer that would inure to the benefit of the corporation. Mozeika knew that fact and Townsley knew that fact. This is not a situation where an unsuspecting corporate shareholder with no legitimate way to protect his interest saw a valuable corporate opportunity usurped by a corporate officer. This is simply a breakdown of a joint venture.

## IV. Denial of Discharge

### A. § 727(a)(5)

 Mozeika also seeks a denial of discharge to Townsley under § 727(a)(5). That section provides for a denial of discharge when the debtor has failed to explain satisfactorily any loss of assets or deficiency of assets to meet the debtor's liabilities. 11 U.S.C. § 727(a)(5).

 Under this section of the Code, the plaintiff has the initial burden of identifying the assets in question by appropriate allegations in the complaint and showing that the debtor at one time had the assets but they are no longer available for the debtor's creditors. Once the creditor has introduced evidence of the disappearance of substantial assets, the burden shifts to the Debtor to explain satisfactorily the losses or deficiencies. *In re Potter*, 88 B.R. 843, 849 (Bkrtcy. N.D.Ill.1988).

■ Mozeika has established that Townsley deposited $315,148.88 into his bank in 1991 and 1992. The money was no longer present when Townsley filed his schedules in March, 1993. Mozeika argues that he has made a prima facie showing that the asset was dissipated and that the burden now shifts to Townsley to satisfactorily explain where the money went. Upon such proof, the statement by Mozeika that the burden then shifts to the Debtor to explain the loss of the asset is correct. However, in this case, Mozeika fails in his initial burden of proving the existence of such an asset. The simple showing of some amount of gross receipts by one who operated a business at a point ranging from a year to several months prior to his bankruptcy does not discharge the original burden of establishing the existence of the asset. Mozeika's argument completely misses the accounting distinction between "gross receipts" and "assets." A business may have a cash flow statement that shows gross receipts over a period of time but then have a balance sheet showing no assets at all. The transfer of gross receipts to assets only occurs when the cash receipts become surplus funds retained in the business after payment of expenses. There is no proof at all that the periodic deposits made by Townsley in 1991 and 1992 were ever "assets."

■ Additionally, Mozeika asserts that Townsley is unable to explain the loss of $627,500.00 in existing accounts. (Exhibit 202). However, as discussed earlier, this was a projected or estimated sales amount from existing clients, not accounts receivable for existing sales. Consequently, the Court finds no liability for the failure to account for the loss of this "asset."

B. *§ 727(a)(4)(A)*

On or about March 12, 1993, Townsley filed his Official Schedules of Property and Creditors along with his Statement of Financial Affairs. As required, Townsley signed the schedules and statements under oath. In October 1993, Townsley filed Amended Schedules, also executed under oath.

In both the original and amended schedules Townsley omitted the $315,148.88 he received relating to sales during 1991 and early 1992. Mozeika asserts that the omission is an intentional misstatement of income and, seeks a denial of discharge under § 727(a)(4)(A).

■ That section provides that a debtor will not be granted a discharge if "the debtor knowingly and fraudulently, in or in connection with the case. . . . made a false oath or account." 11 U.S.C. § 727(a)(4)(A). To sustain an objection to discharge under 11 U.S.C. § 727(a)(4)(A), an objecting creditor must establish the following elements, i) the debtor made a statement under oath; ii) such statement was false; iii) the debtor knew the statement was false; iv) the debtor made the statement with fraudulent intent; and v) the statement related materially to the bankruptcy case. *Matter of Beaubouef,* 966 F.2d 174, 178 (5th Cir.1992).

■ False oaths sufficient to justify the denial of discharge include "(1) a false statement or omission in the debtor's schedules or (2) a false statement by the debtor at the examination during the course of the proceedings." *Id.* Townsley has admitted to omitting from his schedules the $315,148.88 he received from sales.

■ Townsley claims that the money in question was used to pay expenses and the omission was inadvertent because he did not consider it income. The denial of a discharge under § 727(a)(4)(A) cannot be imposed where the false statement was the result of a simple or honest mistake or inadvertence. Rather, to sustain an objection to discharge under this section, the debtor must have willfully made a false statement with intent to defraud his creditors. *In re Bodenstein,* 168 B.R. 23, 32 (Bkrtcy.E.D.N.Y.1994).

■ The Court does not believe that the circumstances of this case warrant an inference of fraudulent intent on the Debtor's part. Mozeika, again, mischaracterizes the money in question. Mozeika argues that this is income to Townsley and therefore should have been reported as income earned in the year in question. This is a misunderstanding of the difference between income and gross receipts. It may or may not have been

income but one does not know whether it is income until the ongoing expenses of the business have been deducted from the gross receipts to arrive at what would have been the income of the business proprietor. We don't know the answer to that question but simply proving the existence of some gross receipts is not sufficient to shift the burden of proof to the Debtor to establish that it was not income. There must be proof sufficient to raise a serious doubt in the mind of the trier of fact as to whether or not this could have been income. In this case, there is no question but that it is not income and therefore, the Plaintiff fails in his initial burden.

The request for denial of discharge pursuant to 11 U.S.C. § 727(a)(4)(A) must be denied.

### ORDER

Pursuant to regular setting the Court heard the Original Complaint to Determine Dischargeability of Debt and to Object to Discharge. Considering the pleadings on file, the evidence presented, the argument of counsel and for the reasons stated in the written opinion signed contemporaneously herewith, the Court believes the complaint should be and is hereby denied.

It is further ORDERED that all further requested relief is hereby DENIED.